# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Northern Lakes Data Corp.,<br>and Ashok Sinha,<br><br>       Plaintiffs,<br><br>    v.<br><br>Telvent GIT, S.A.;<br>Telvent USA Corporation;<br>BancPass, Inc.;<br>and Glenn Deitiker, individually and as<br>an officer and representative of<br>Telvent USA Corporation and<br>Telvent GIT, S.A.<br><br>       Defendants. | **COMPLAINT** |

Plaintiffs Northern Lakes Data Corp. ("NLDC") and Ashok Sinha ("Ashok"), for their Complaint against Defendants Telvent USA Corporation ("Telvent"), BancPass, Inc. ("BancPass"), and Glenn Deitiker ("Deitiker"), state and allege as follows:

## I.   INTRODUCTION

1.   Plaintiff Ashok Sinha and his company NLDC were prominent players in the business of software support for back office functions of electronic tolling authorities. Ashok and NLDC were approached by Defendant Telvent and induced to enter into a transaction in which NLDC sold TollPro, one of Plaintiffs' software products, to Telvent in exchange for cash and the opportunity for future

SCANNED

JUL 1 2011

U.S. DISTRICT COURT MPLS

payments. Telvent was to create a new business unit within Telvent to exploit TollPro, and Telvent was also to provide Ashok the opportunity to earn future payments by generating sales as Vice President of the new business unit. Based on Telvent's inducements, including promises to pay Plaintiffs $9 million through the transaction (including $5.5 million in future payments) as well as the opportunity to strengthen the TollPro brand and reputation, Plaintiffs gave up substantial other business opportunities.

2.     It is now evident that Defendant Telvent never had any intention of honoring its agreements. Rather, it intentionally misrepresented its intentions to create the new business unit. More than two years after the purchase transaction closed, Telvent still has not created the new business unit. Indeed, Telvent has availed itself of every opportunity, through mendacity and fraud, to undermine Ashok's efforts to exploit TollPro.

3.     The result has been that TollPro has languished and its reputation and marketability have wrongfully been undermined. Because of Telvent's fraudulent misrepresentations that it intended to use and exploit TollPro, and that Plaintiffs would be given the opportunity to earn a portion of the TollPro revenue, Plaintiffs have been deprived of TollPro, a valuable asset, and have received only a fraction of its true value. Furthermore, Plaintiffs have been deprived of the promised opportunity to earn the promised future payments under the subject agreements. Plaintiffs bring this lawsuit to recover the value of the TollPro asset

2

that was wrongfully taken from them – a value in the millions of dollars – as well as the promised future payments and various other relief.

## II. PARTIES, JURISDICTION, AND VENUE

4.     Northern Lakes Data Corp. is a Minnesota corporation with a registered office and principal place of business at 18280 Overland Trail, Eden Prairie, MN 55347-4191.

5.     Ashok Sinha is an individual who resides in Eden Prairie, Minnesota. Ashok is the President of NLDC and its sole owner. Ashok is also a shareholder of Telvent GIT, S.A., the parent company of Telvent USA Corporation.

6.     Telvent GIT, S.A. ("Telvent S.A.") is a Spanish telecommunications company whose shares are and were publicly traded in the U.S. on the NASDAQ exchange at all times material hereto. Upon information and belief, its principal place of business is located at Valgrande 6, Alcobendas, Madrid, 28108, Spain.

7.     Telvent Farradyne Inc. ("Telvent Farradyne") was a Maryland corporation with a principal place of business at 1390 Piccard Drive, Rockville, MD 20850. Upon information and belief, Telvent Farradyne is no longer in existence, but during its existence it was a wholly owned subsidiary of Telvent S.A.

8.     Telvent USA Corporation ("Telvent USA") is a Maryland corporation with a principal place of business at 1390 Piccard Drive, Rockville, MD 20850. Upon information and belief, Telvent USA has assumed the

obligations of Telvent Farradyne with respect to the agreements alleged in this Complaint between Telvent Farradyne and Plaintiffs. Upon information and belief, Telvent USA is a wholly owned subsidiary of Telvent S.A. Telvent Farradyne, and Telvent USA as its successor, along with Telvent GIT, S.A. shall be collectively referred to as "Telvent" herein.

9.    BancPass, Inc. is a Texas corporation with a principal place of business at 211 East 7th Street, Suite 800, Austin, TX 78701.

10.    Glenn Deitiker is an individual who resides in Texas.

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiffs are citizens of Minnesota, and Defendants are citizens of various other states, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.    In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367 because Plaintiffs' Lanham Act claims are claims arising under the laws of the United States ("federal claims"), and supplemental jurisdiction is proper because Plaintiffs' other claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

13.    The agreements between Plaintiffs and Telvent that are a subject of this lawsuit variously specify that they shall be construed in accordance with and governed by the laws of the State of Minnesota, and with respect to some of the agreements, that "any disputes arising out of this Agreement shall be litigated

exclusively in courts located in Hennepin County, Minnesota." In addition, Telvent employed Ashok in Minnesota and directed instructions and communications to Ashok in Minnesota. Because of these and other material contacts between Telvent and the State of Minnesota, personal jurisdiction over Telvent is proper.

14.    Defendant Deitiker interfered with the agreements between Plaintiffs and Telvent that are a subject of this lawsuit and directed instructions and communications to Ashok in Minnesota, for the benefit of himself and BancPass. This and other material acts of misconduct by Defendants Deitiker and BancPass giving rise to the instant action arose and took place in Minnesota. Because of these and other material contacts between Defendants Deitiker and BancPass and the State of Minnesota, personal jurisdiction over Defendants Deitiker and BancPass is proper.

15.    The employment agreement between Ashok and Telvent states that the parties "agree that any disputes arising out of this Agreement shall be litigated exclusively in courts located in Hennepin County, Minnesota." Because of this and other facts, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Minnesota. In addition, Telvent conducts business in the District of Minnesota and is subject to personal jurisdiction in the District of Minnesota and therefore venue is proper in the District of Minnesota pursuant to 28 U.S.C. §§ 1391(a)(1) and (2) and 1391(b)(1) and (2).

## III.   FACTUAL ALLEGATIONS

### Plaintiffs and TollPro/E-470 Works

16.   Plaintiff Ashok Sinha is a well respected and experienced figure within the electronic toll collection field.  For nearly twenty years Ashok has worked developing software to support back office functions of electronic tolling authorities and similar endeavors.  Ashok earned his Bachelor of Science degree in electrical engineering at the Indian Institute of Technology in Kanpur, India, one of the most prestigious schools in that country.  He earned his Master of Science degree in computer science, as well as a Master of Business Administration degree, from the University of Wisconsin at Madison.  Because of his many years of experience, and his long record of implementing successful installations of back office tolling software, Ashok is one of the most qualified individuals in the world to develop and implement back office tolling systems.  His reputation in the tolling community is commensurate with his long and successful record.

17.   Ashok created TollPro, a software package and process that supports the back office functions of electronic tolling authorities and similar endeavors. TollPro can be used to serve electronic toll roads (such as the MNPass toll roads found on I-35W and I-394 in the Twin Cities), bus or train transit systems, automatic red light cameras, and other similar transportation-related tolling or enforcement projects.

18.   For example, TollPro software is currently used by the Orange County Transportation Authority (OCTA) in the Interstate 91 Express Lanes in

Anaheim, California.   Predecessor software to TollPro was used by the Pennsylvania Turnpike Commission, and for the Metro Manila Skyway and the South Luzon Expressway in Manila, the Philippines.   A derivative product of TollPro is currently used by the E-470 Public Highway Authority in Aurora, Colorado.   It is called E-470 Works.  E-470 Works was not part of the transaction at issue in this case.   E-470 Works is known in the industry as a TollPro product/derivative, and therefore the reputation of TollPro directly affects the reputation of E-470 Works.

19.   "Back office functions" include the business, record-keeping, and financial transactions of electronic tolling project authorities.  For example, the operation of a Customer Service Center (CSC), which allows the tolling authority to manage the names, addresses, and account balances of a toll pass holder or other customer, is a part of the back office functions.   Likewise, Violation Processing (VPS or VPC) allows the tolling authority to provide notices of violations to people who have unpaid tolls or other violations of relevant rules, and can also perform such functions as preparing evidence packages for court hearings based on video images of vehicle license plates and other relevant information, and/or forwarding histories to collection agencies, is also a part of the back office functions.

20.   Software that manages back office functions is distinct from software to manage "lane" functions, including determining whether a particular

vehicle or customer has been in a toll lane, and software to manage "toll plaza" functions.

21.   TollPro is a flexible product, able to be adapted to diverse installations and is scalable for growth of customer size, geography, or transaction volumes with relatively little additional coding.  Prior to Telvent's efforts to acquire TollPro, described below, TollPro was one of the major products in the tolling back office market.

22.   Information regarding TollPro, including the software code itself and technical design documents, is highly valuable and provides the framework by which a competitor could produce a product competitive with TollPro. Accordingly, Plaintiffs have always taken efforts to prevent this information from being disclosed to, or used by, the public.

## Defendants Deitiker's & BancPass's Relationship to Defendant Telvent

23.   Prior to 2007, Deitiker was the President of a company called Caseta.  Caseta was a small toll system integrator without an established history of success.  Deitiker came to Telvent in 2007, when Telvent Faradyne's parent company, Telvent N.A., purchased Caseta and created a new division, named Telvent Caseta, to house it.  Neither Caseta nor Telvent Caseta owned any back office tolling software products.

24.   Upon the creation of Telvent Caseta in 2007, Deitiker entered into an employment contract naming him President of Telvent Caseta.  The terms of

Deitiker's agreement with Telvent Caseta provided him with complete control over tolling business operations at Telvent and its affiliated companies.

25.     Deitiker also holds a major interest in, and is an officer of, Defendant BancPass. BancPass was not purchased by Telvent and is purportedly a separate company. BancPass's main product is a back office tolling software product called PToll; it competes directly with TollPro.  On information and belief, Deitiker's agreement with Telvent prohibited BancPass from competing with Telvent.   With full knowledge of Telvent, Deitiker has breached that obligation without consequence.

26.     In approximately 2010, both Telvent Faradyne and Telvent Caseta were merged into Telvent USA.  Organizationally, Telvent Caseta became the Tolling Group in the Transportation Division of Telvent USA.   Deitiker is currently a Senior Vice President and head of the Tolling Group in the Transportation Division of Telvent USA.  He reports to Pat McGowan, President of the Transportation Division of Telvent USA, but continues to have complete control over the tolling business operations of Telvent.

27.     Shannon Swank is an officer of the Transportation Division – Tolling Group of Telvent USA.  She reports to Deitiker.  On information and belief, her title is Vice President of Business Development.  She is also an officer of BancPass.

## Telvent Approaches Plaintiffs Regarding TollPro

28.   In 2008, Telvent approached Plaintiffs about the possibility of purchasing TollPro. Telvent informed Plaintiffs that it was interested in acquiring TollPro and other NLDC assets related to the back office business in order to establish a thriving back office business at Telvent.

29.   Telvent stated that it intended to create an entirely new business unit to focus on generating revenue from TollPro and further build TollPro's marketability and reputation. Ashok was promised that he would be in charge of this new business unit and that along with the lane subsystem tolling business, the back office revenue of TollPro would soar. Ashok was also promised that he would have at least 4-5 employees working for him in the SBS unit, along with a commensurate budget.

30.   In early 2009, Plaintiffs and Telvent entered into certain agreements, including without limitation an Employment Agreement (a copy of which is attached hereto as Exhibit A), a Consulting Services Agreement (a copy of which is attached hereto as Exhibit B), and an Asset Purchase Agreement (a copy of which is attached hereto as Exhibit C), collectively referred to as the "Agreements."

31.   During the negotiations, Telvent never informed Plaintiffs of its contract with Deitiker, giving him complete control over tolling business operations at Telvent and its affiliated companies. Neither did Telvent inform

Plaintiffs that Deitiker had a financial interest in BancPass, a competitor to TollPro.

32.    Rather, Telvent raised the possibility of having Ashok report directly to Deitiker. This idea was rejected immediately and clearly by Ashok, because he did not want to have the back office unit reporting to what he thought was another peer, non-back office unit. As a result, Telvent established that Ashok would report to Larry Yermack, President of Telvent – to whom Deitiker also reported.

33.    The Agreements include provisions which prohibit Plaintiffs from operating in any business activity in which Telvent is engaged including, in particular, the tolling back office business, during the term of the Agreements and for years thereafter.

## The Agreements – Employment Agreement

34.    The Employment Agreement was executed on February 2, 2009.

35.    In the Employment Agreement, Telvent promised to appoint Ashok as "Vice President – Strategic Business Systems of Telvent," reporting to Larry Yermack, then President of Telvent. The Employment Agreement describes Ashok's duties in part as follows:

> As Vice President – Strategic Business Systems, you will be responsible for managing the marketing, business development, sales and technology development activities of the new Strategic Business Systems division of Telvent. Your duties will include:
>
> 1.    Sales of back-office and customer service center systems utilizing the TollPro Software or other software developed by the Strategic Business Systems division;

2.  Supporting projects which include the delivery of both electronic toll collection systems and the systems and software referred to in sub-paragraph 1 above;

3.  Development of new technology related to back-office and customer service center systems, in accordance with research and development budgets approved by the Board of Directors of Telvent; and

4.  Such other duties compatible with your position, as Telvent may reasonably require, including performing duties for affiliates of Telvent, including without limitation Telvent Caseta, Inc.

During the term of your employment, you shall devote your business time and attention exclusively to Telvent and you shall not be employed in or engaged in promoting or carrying on any other business that is competitive with the business of Telvent....

36.    In fact, it would have been in violation of its contractual commitment to Deitiker for Telvent to make Ashok "responsible for managing the marketing, business development, sales and technology development activities of the new Strategic Business Systems division" because Telvent had already committed to give Deitiker total control over anything that he in his sole discretion believed would in any way interfere with him earning his incentive compensation.

37.    The Employment Agreement specifies Ashok's salary and his term of employment, which was envisioned to continue at least through December 31, 2011. Prior to that point, Ashok was entitled to a severance package if he was terminated without cause or if he resigned for good reason.

38.    The Employment Agreement also contains non-compete provisions, purporting to prohibit Ashok from competing with Telvent for a period of one year

after his employment if he was terminated for cause or resigned without good reason.

39.    The Employment Agreement specifies "Good Reason" for resignation to include "any material decrease in your title, responsibilities, authorities, powers or duties."

40.    The Employment Agreement also contains a provision denominated "Choice of Laws and Venue":

> This Agreement is governed by the laws of the State of Minnesota without giving effect to any conflict of law provisions of such state. The parties hereto agree that any disputes arising out of this Agreement shall be litigated exclusively in courts located in Hennepin County, Minnesota.

## The Agreements – Consulting Services Agreement

41.    The Consulting Services Agreement was executed on February 2, 2009, with an Effective Date of January 30, 2009. The Consulting Services Agreement provides for NLDC to provide consulting services to Telvent for a term through December 31, 2011. In exchange for the consulting services, NLDC was to receive two kinds of payments: "Fixed R&D Payments" and "Incentive R&D Payments."

42.    The "Fixed R&D Payments" include four payments of $500,000 each, to be paid at intervals during the term of the Consulting Services Agreement. Telvent has made all such payments, although it did not make most of them by the dates specified in the Consulting Services Agreement.

43.    The "Fixed R&D Payments" also include two conditional $250,000 payments.    If by December 31, 2010 Telvent was awarded a back office installation using TollPro software "as a result of a bid or proposal submitted by Telvent using the E-470 system [an NLDC customer] as a reference," then NLDC was entitled to an additional $250,000 Fixed R&D Payment.  And if by December 31, 2010 Telvent signed an agreement to replace an existing maintenance agreement between NLDC and the E-470 highway authority, then NLDC was entitled to an additional, separate, $250,000 Fixed R&D Payment.  Telvent has not made any of the conditional Fixed R&D Payments.

44.    The "Incentive R&D Payments" amount to 2% of Telvent's qualifying revenue, which includes revenue from "back-office and customer service center systems utilizing the TollPro Software or other software developed by the Strategic Business Systems business unit of Telvent and associated services" and "new technology related to back-office and customer service center systems which is developed by the Strategic Business Systems business unit." Under the Consulting Services Agreement the Incentive R&D Payments were to be made quarterly and were capped at $5 million.  Telvent has not made any Incentive R&D Payments.

45.    The Consulting Services Agreement also contains a Minnesota choice of law provision.

## The Agreements – Asset Purchase Agreement

46.    The Asset Purchase Agreement was executed on February 2, 2009, with an Effective Date of January 30, 2009.  The Asset Purchase Agreement provides for the sale by NLDC to Telvent of certain assets, including the TollPro Software.  The Asset Purchase Agreement provides for a purchase price of $1,500,000, to be paid as follows: $1 million at closing, and $500,000 on January 12, 2012.

47.    Telvent has made the $1 million payment to NLDC, but the $500,000 payment is still outstanding.

48.    The Asset Purchase Agreement also contains non-competition provisions purporting to bar NLDC from competing with Telvent anywhere in the world until "the fourth anniversary of the Effective Date."

49.    The Asset Purchase Agreement also contains a Minnesota choice of law provision.

50.    The Asset Purchase Agreement contains a provision stating that:

> This Agreement (including the Schedules), the Confidentiality Agreement dated March 17, 2008, by and among Telvent Traffic North America Inc., [NLDC] and Ashok Sinha, and the other certificates, agreements and other instruments to be executed and delivered by the parties in connection with the transactions contemplated hereby, constitute the sole understanding of the parties with respect to the subject matter hereof.

The Consulting Services Agreement and the Employment Agreement are "agreements … to be executed and delivered by the parties in connection with the transactions contemplated" in the Asset Purchase Agreement.

## Telvent Fails to Live Up To Its Commitments And Defrauds Plaintiffs

51.   Following the execution of the Agreements, Telvent materially breached the Agreements. Telvent has not created a Strategic Business Systems ("SBS") unit, and it has not given Ashok any authority, staff, or budget to take any of the actions necessary to make sales of TollPro-related software. Indeed, Telvent could not have done so consistent with its pre-existing obligations to Deitiker. Rather, consistent with Deitiker's desires, Telvent has attempted at every step to undermine Ashok's efforts to earn SBS Revenue, which was the agreed-upon trigger for his contractual incentive compensation.

52.   Based upon its conduct, it is clear that Telvent never intended to allow Ashok to succeed in his new position. Instead, Telvent effectively took Ashok and his prime asset, TollPro, out of the market for tolling back office products.

53.   First, Telvent has not created an SBS unit of any kind over which Ashok could serve as Vice President. Although Ashok's business card reads "Vice President – Strategic Business Systems," in fact the SBS unit "exists" only on paper. It has no employees assigned to it, contrary to the explicit promises made to Ashok. Ashok also has no budget nor any authority over any funds allocated to the so-called SBS unit despite the promises made to him. Instead, any requests for SBS funds, which are necessary for Ashok to place bids for back office business (or to do anything else), must come through another unit headed by Deitiker and are subject to the approval of Deitiker.

16

54.   Indeed, Ashok is effectively subject to supervision by Deitiker, contrary to the explicit promises made to him during the negotiation of the Agreements and written into the Agreements. Although, as heads of groups in the Transportation Division, Ashok and Deitiker were ostensibly to be equals, both reporting to McGowan, McGowan consistently requires Ashok to run budgetary requests or other requests through Deitiker or his business unit.   This is particularly harmful to Ashok for several reasons as already stated and because Deitiker has stated that he considers TollPro to be a competitor and will never allow TollPro to "see the light of day."   Telvent has, since the acquisition of TollPro, known of this consequence.

55.   In many ways Defendants have acted to impair Ashok's efforts to sell back office business on behalf of Telvent and to build the SBS Division.

56.   Defendants have repeatedly and falsely stated to Ashok that RFPs issued by potential customers have no back office component. In fact the RFPs did have back office components, and Defendants knew that the RFPs had such components when they made their misrepresentations.   As a result of these falsehoods and misrepresentations, Ashok has not had the opportunity to place a bid for back office services in response to these RFPs.

57.   Defendants have repeatedly caused Telvent not to bid on back office business, claiming that it is not "suitable" or "attractive" for TollPro, when in fact the projects represented very good prospects for TollPro. This has occurred with respect to the HCTRA, I580, and ATI projects and, upon information and belief,

17

with respect to other potential projects as well. In addition, Defendants have arranged for BancPass or other TollPro competitors to bid on some or all of that back office business. This has occurred with respect to the HCTRA project and, upon information and belief, with respect to other potential projects as well.

58.     Deitiker and Swank have created confusion by calling on the same potential customers in two separate capacities – both in their capacity as Telvent representatives (selling lane software) and in their capacity as BancPass representatives (selling back office software, in competition with Telvent's SBS unit, including the TollPro back office software). This confusion undermines Ashok's opportunities to sell the TollPro back office software to potential customers, as it suggests that Telvent does not back TollPro. This has occurred with respect to the Colorado E-470 Public Highway Authority ("E-470 Authority"), WSDOT, and TXDOT projects and, upon information and belief, with respect to other potential projects as well.

59.     In connection with the Montreal A30 project, Defendants specifically informed Ashok that an RFP related to the project, and which she had responsibility for notifying Ashok regarding the RFP, did not have a back office component, when in fact it did and she knew it did. This falsehood allowed Defendants BancPass and Deitiker to escape early scrutiny regarding actions they had taken to get content inserted into the RFP phase that would favor BancPass over all other competitors including Telvent and TollPro. This action was taken when Deitiker was a senior management employee at Telvent.

18

60.   In connection with the Transurban project, Defendants stated that they would only consider including TollPro in a bid if Ashok could customize TollPro for the project at a cost of only $50,000 or less, which was not feasible. Instead of using TollPro for the bid, Defendants used an old Caseta product that had to be reengineered for the bid and customized for the project at a cost exceeding $250,000.

61.   In connection with the E-470 Authority project, Defendants suggested to one of the directors of the E-470 Authority that the Authority should not negotiate with Ashok by falsely stating that Ashok was going to be leaving Telvent soon.

62.   In connection with the TXDOT project, estimated to be approximately $50 million in revenue value, Ashok was specifically told that he would have approval to hire anyone he wanted to support his bid. But when Ashok chose an individual who was ideal for the job, Defendants forbid Ashok from hiring him, making it impossible for Ashok to submit a competitive bid.

63.   Defendants have at various times denigrated TollPro, stating to potential customers that TollPro is "vaporware," that the intellectual property of TollPro is subject to legal challenge, and that TollPro is not a good product. This has occurred with respect to the WSDOT project and, on information and belief, on other occasions.

64.   Defendants' actions have made it virtually impossible for Ashok to secure contracts for the SBS unit. As a result, NLDC has not achieved the

19

benchmarks for Fixed R&D Payments related to the E-470 Authority project, which were potentially worth $500,000. In addition, NLDC has not received the benefits of the 2% Incentive R&D Payments, which were potentially worth $5 million.

65.     Defendants' actions have also had a significant negative impact on NLDC's E-470 Works product which was not part of the Telvent purchase agreement and is still owned by NLDC. Moreover, as it relates to NLDC's E-470 Works product, Telvent made explicit negative comments to the director of the E-470 Authority causing the E-470 Authority to end its contracts with NLDC for maintenance of the back office system at the E-470 Authority which had been generating approximately $1 million in annual revenue for NLDC. Telvent's interference with the NLDC/E-470 Authority relationship occurred at the same time Deitiker was pitching the E-470 Authority to sign a contract with BancPass in direct conflict with and to the detriment of Telvent and TollPro.

66.     On numerous occasions, Ashok has notified McGowan that Deitiker was undermining Ashok's ability to secure SBS contracts by marketing the BancPass product to potential customers. McGowan has refused to take any action against Deitiker.

67.     In addition, Defendants have permitted technical design documents relating to TollPro to be transmitted to a third party consulting firm, Jaffa. The Jaffa firm also works with BancPass. On information and belief, Defendants have instructed the Jaffa firm to transmit the technical design documents to BancPass.

68.   The actions taken by Deitiker, an officer of Telvent, are imputed to Telvent.  In addition, Ashok has repeatedly informed Telvent's upper management of Telvent's wrongful conduct, including the efforts taken by Deitiker and Swank to sabotage the TollPro/SBS business.  Telvent has taken no action, despite having full knowledge of Deitiker's wrongdoing.

69.   Defendants' actions are a material breach of the Agreements and constitute "Good Reason" for Ashok to resign under the Employment Agreement.

70.   On April 21, 2010, Ashok sent a letter, through his then-attorneys, to Cameron Demcoe, Director of Legal Services North America for Telvent Farradyne.  The letter spelled out Telvent's numerous breaches of the Agreements, including failure to create, fund, or staff an SBS division; failure to accord Ashok the authority or management responsibilities commensurate with his title; and efforts by Telvent personnel, including Deitiker, to exclude Ashok from decision-making.  The letter pointed out that Telvent's actions frustrated NLDC's promised expectations regarding the Incentive R&D payments, and identified the issue with the BancPass product competing with TollPro.  In response to the April 21, 2010 letter, Demcoe contacted Ashok and told Ashok that Deitiker would be fired by January of 2011.  Demcoe also stated that McGowan would respond in writing to the letter, but McGowan never did so.

## Telvent Seeks to Purchase BancPass

71. Telvent is currently actively negotiating to acquire BancPass. On information and belief, Telvent intends to acquire BancPass based on a price of $14 million.

## IV.   CAUSES OF ACTION

### Count One – Fraudulent Misrepresentation – In Inducement
### (Against Telvent)

72. Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

73. Plaintiffs entered into the Agreements with Telvent based upon Telvent's material representations and assurances, by its words and actions, that it intended to perform under the Agreements, and that no person at Telvent had a financial interest in a product competitive with TollPro.

74. Telvent's representations were false.

75. Telvent's false representations were made knowingly and intentionally, with intent to induce Plaintiffs to enter into the Agreements.

76. Plaintiffs reasonably relied upon Telvent's representations and assurances in entering into the Agreements, and Plaintiffs were induced by such representations and assurances to enter into the Agreements.

77. Plaintiffs have been damaged by Telvent's fraudulent inducement of Plaintiffs to enter into the Agreements. By virtue of Defendants' failure to market and use the TollPro property and processes, and by virtue of the non-competition

restrictions of the Agreements, Plaintiffs have been deprived of substantial earnings and profits.

## Count Two – Fraudulent Misrepresentation – In Performance
### (Against Telvent)

78.    Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

79.    Plaintiffs did not terminate the Agreements with Telvent, even though good reason to do so existed, based upon Telvent's material representations and assurances, including those described with particularity in paragraph 70 above, that it intended to remedy its breaches of the Agreements.

80.    Telvent's representations were false.

81.    Telvent's false representations were made knowingly and intentionally, with intent to induce Plaintiffs not to terminate the Agreements.

82.    Plaintiffs reasonably relied upon Telvent's representations and assurances in not terminating the Agreements, and Plaintiffs were induced by such representations and assurances not to terminate the Agreements.

83.    Plaintiffs have been damaged by Telvent's fraudulent misrepresentations. By virtue of Defendants' failure to market and use the TollPro property and processes, and by virtue of the non-competition restrictions of the Agreements, Plaintiffs have been deprived of substantial earnings and profits.

## Count Three – Fraudulent Misrepresentation – In Performance
### (Against All Defendants)

84.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

85.   Defendants made false representations, including those described with particularity in paragraphs 56, 57, and 59, above, relating to the availability of opportunities for potential SBS business.

86.   Defendants' representations were false.

87.   Defendants' false representations were made knowingly and intentionally, with intent to induce Plaintiffs not to pursue potential opportunities for SBS business.

88.   Plaintiffs reasonably relied upon Defendants' representations and assurances in not pursuing potential opportunities for SBS business, and Plaintiffs were induced by such representations and assurances not to pursue the business.

89.   Plaintiffs have been damaged by Telvent's fraudulent misrepresentations.  In particular, Plaintiffs have been denied potential business opportunities and thus incentive payments.

## Count Four – Common Law Misappropriation
### (Against All Defendants)

90.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

91.   Plaintiffs have made a substantial investment of time, effort, and money over many years in developing goodwill associated with and public recognition of the TollPro and NLDC names and products.

92.   By using the subject goodwill for its own benefit and without proper remuneration to Plaintiffs, Defendants have misappropriated Plaintiffs' and TollPro's goodwill and reputation without any just compensation, payment, consideration, or consent, and are unjustly reaping the benefit of Plaintiffs' and TollPro's trade materials.

93.   Defendants' exercise of dominion and control over the subject goodwill has been overt, inasmuch as Defendants have attempted to and succeeded at causing confusion between TollPro and Defendants' companies and have traded on TollPro's goodwill.

94.   As a direct and proximate result of Defendants' wrongful acts, Plaintiffs have suffered and continue to suffer and are likely to suffer from Defendants' misappropriation of goodwill. Defendants will continue, unless restrained, to use the subject goodwill and will cause irreparable damage to Plaintiffs.

95.   Plaintiffs have no adequate remedy at law.

96.   Plaintiffs are entitled to an injunction restraining Defendants, their agents, employees, and all persons acting in concert with Defendants from engaging in further misappropriation of goodwill.

97.   Plaintiffs are entitled to recover from Defendants damages that they have sustained and/or are likely to sustain as a result of Defendants' wrongful acts. Plaintiffs are currently unable to ascertain the full extent of the monetary damages they have suffered and/or are likely to sustain by reason of Defendants' misappropriation of goodwill.

98.   Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages that Defendants have obtained as a result of their wrongful acts. Plaintiffs are currently unable to ascertain the extent of the gains, profits, and advantages that Defendants have realized by reasons of their misappropriation of goodwill.

<u>**Count Five – Conversion**</u>
<u>**(Against All Defendants)**</u>

99.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

100.   Plaintiffs are the true owners of the TollPro property, processes, and funds.

101.   Defendants have wrongfully deprived Plaintiffs of the use and control of Plaintiffs' property, processes, and funds, having assumed dominion over them, inconsistent with the rights of Plaintiffs.

102.   Defendants' exercise of dominion and control over the subject property, processes, and funds has been overt, inasmuch as they have, inter alia,

made representations and "no bids" to various clients and prospective clients, as detailed more fully above.

103.   Defendants interference with Plaintiffs' use and control of Plaintiffs' property, processes, and funds has been willful and intentional, and without lawful justification.

104.   Additionally, by virtue of Defendants' failure to market and use the TollPro property and processes, and by virtue of the non-competition restrictions of the Agreements, Plaintiffs have been deprived of substantial earnings and profits.

105.   Plaintiffs have demanded the return of such property, processes, and funds from Defendant, which demand Defendants have refused to comply with.

## Count Six – Misappropriation of Trade Secrets
### (Against All Defendants)

106.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

107.   Defendants have misappropriated Plaintiffs' trade secrets, including, among other things, the software code itself and technical design documents.

108.   As a direct and proximate result of Defendants' wrongful acts, Plaintiffs have suffered and continue to suffer and are likely to suffer from Defendants' misappropriation of trade secrets. Defendants will continue, unless restrained, to use the subject trade secrets and will cause irreparable damage to Ashok.

109.   Plaintiffs have no adequate remedy at law.

110.   Plaintiffs are entitled to an injunction restraining Defendants, their agents, employees, and all persons acting in concert with Defendants from engaging in further misappropriation and use of Plaintiffs' trade secrets.

111.   Plaintiffs are entitled to recover from Defendants damages that they have sustained and/or are likely to sustain as a result of Defendants' continuing wrongful acts.  Plaintiffs are currently unable to ascertain the full extent of the monetary damages they have suffered and/or are likely to sustain by reason of Defendants' misappropriation of trade secrets.

112.   Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages that Defendants have obtained as a result of their wrongful acts.  Plaintiffs are currently unable to ascertain the full extent of the gains, profits, and advantages that Defendants have realized by reasons of their misappropriation of trade secrets.

### Count Seven– Breach of Contract
### (Against Telvent)

113.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

114.   Plaintiffs entered into Agreements with Telvent under which Telvent was to create an SBS division and make Ashok the head of that division, and Telvent was to make incentive payments to NLDC based upon SBS-related sales.

115.   The Agreements constituted a binding and enforceable contract.

116.   Plaintiffs have fully performed under the contract.

117.   Telvent breached the Agreements by, among other things, failing to create an SBS unit, failing to provide Ashok with staff or funding to operate an SBS unit, failing to provide Ashok with the authority commensurate with his promised position, and permitting Telvent officers to market products to potential Telvent customers in competition with the SBS unit.

118.   Telvent's breach directly and proximately caused Plaintiffs to sustain substantial damages.

119.   Telvent is liable to Plaintiffs for the full amount of their damages, in an amount of at least $6M.

## Count Eight– Breach of Covenant of Good Faith And Fair Dealing
## (Against Telvent)

120.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

121.   A covenant of good faith and fair dealing was implied in Plaintiffs' negotiations and Agreements with Telvent.

122.   It is evident that Telvent did not enter into the Agreements in good faith. Telvent willfully and maliciously denied Plaintiffs the opportunity to obtain the benefit of their bargain under the terms of the Agreements.

123.   Telvent's actions in preventing Plaintiffs from succeeding breached the covenant of good faith and fair dealing that Telvent owed to Plaintiffs.

124.   Telvent's breach directly and proximately caused Plaintiffs to sustain substantial damages.

125.   Telvent is liable to Plaintiffs for the full amount of their damages in an amount of at least $6M.

## Count Nine – Promissory Estoppel
### (Against Telvent)

126.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

127.   Telvent made material promises, assurances and represenations to Plaintiffs, including that Telvent would create an SBS division and make Ashok the head of that division, that Telvent would make incentive payments to NLDC based upon SBS-related sales, and that Deitiker's employment with Telvent would be terminated.

128.   Telvent intended that Plaintiffs rely upon Telvent's promises, representations, and assurances, and Plaintiffs did in fact reasonably rely upon Telvent's promises, representations, and assurances, to their detriment.

129.   Telvent is liable for Plaintiffs' damages incurred in reliance on Telvent's material promises, representations, and assurances.

## Count Ten– Tortious Interference with Contract
### (Against BancPass and Deitiker)

130.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

131.   The Agreements are valid and enforceable contracts between Plaintiffs and Telvent.

132.   Defendants BancPass and Deitiker knew of the Agreements and the promises and obligations contained therein.

133.   Defendants BancPass and Deitiker induced and procured Telvent's breach of the Agreements.

134.   Defendants BancPass and Deitiker's interference with the Agreements was both knowing and without justification.

135.   Defendants BancPass and Deitiker's interference was not subject to any privilege.

136.   As a direct result of the Defendants BancPass and Deitiker's tortious interference, Plaintiffs suffered harm in an amount to be established during the discovery period and proven at trial.

## Count Eleven– Tortious Interference with Prospective Business Advantage (Against All Defendants)

137.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

138.   Defendants willfully and maliciously prevented Plaintiffs from entering into business relationships with potential tolling back office customers, thereby interfering in Plaintiffs' prospective business relations with those available and potential customers.

139. Defendants' interference was both knowing and without justification.

140. Defendants' interference was not subject to any privilege.

141. As a direct result of the Defendants' tortious interference, Plaintiffs suffered harm in an amount to be established during the discovery period and proven at trial.

### Count Twelve – Tortious Interference with Business Advantage (Against All Defendants)

142. Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

143. Defendants willfully and maliciously prevented NLDC from renewing its business relationship with the E-470 Authority, thereby interfering in Plaintiffs' business relations with the Authority.

144. Defendants' interference was both knowing and without justification.

145. Defendants' interference was not subject to any privilege.

146. As a direct result of the Defendants' tortious interference, Plaintiffs suffered harm in an amount to be established during the discovery period and proven at trial.

## Count Thirteen – Breach of Lanham Act
## (Against All Defendants)

147.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

148.   Defendants made false statements and misrepresentations of and concerning Plaintiffs, including, but not limited to, communicating false and misleading statements about the products of Plaintiffs.

149.   Defendants' false statements and misrepresentations of and concerning Plaintiffs were published, disseminated, or otherwise communicated by Defendants.

150.   The aforementioned false statements and misrepresentations made by Defendants of and concerning Plaintiffs' products were published, disseminated, or otherwise communicated by Defendants across state borders and in interstate commerce.

151.   The aforementioned false statements and representations made by Defendants of and concerning Plaintiffs were statements and representations of a commercial nature and constituted commercial speech because they were published, disseminated, or otherwise communicated with the intent of increasing Defendants' sales and/or decreasing Plaintiffs' sales and business opportunities.

152.   The aforementioned false statements and representations actually deceived and had a tendency to deceive a substantial segment of the intended audience of potential and actual customers and consumers.   These false,

## Count Fifteen – Unjust Enrichment
## (Against All Defendants)

163.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

164.   Defendants received numerous benefits from their fraudulent conduct, including possession and control of the TollPro software and freedom from competition from the TollPro software.

165.   Because of Defendants' fraudulent conduct, Defendants were not entitled to the benefits they received.

166.   As a result of Defendants' intentional actions, justice demands that Plaintiffs be awarded damages in the amount that Defendants were unjustly enriched.

## V.   JURY DEMAND

167.   Plaintiffs hereby demand a trial by jury on all claims and issues for which they have a right to trial by jury

## VI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant it the following relief:

    a.   monetary damages, including but not limited to compensatory damages, consequential damages, lost profits, reliance damages, and damages for loss of business;

b.   punitive damages;

c.   pre-judgment interest;

d.   an Order that Defendants, their agents, servants, employees, partners, representatives, attorneys, and all persons in active concert or participation with Defendants or with any of the foregoing be enjoined, on a worldwide basis, preliminarily during the pendency of this action and permanently thereafter from:

   (i)   Trading on Plaintiffs' or TollPro's trade materials;

   (ii)   Publishing statements relating to Plaintiffs or TollPro to third parties;

   (iii)   Engaging in any act which dilutes or is likely to dilute the distinctive quality of Plaintiffs' or TollPro's trade materials or business goodwill, and

   (iv)   Enforcing the subject agreements and contracts;

d.   a declaration, pursuant to 28 U.S.C. § 2201(a), that the non-competition provisions in the Agreements are unenforceable;

e.   attorney fees, costs, and disbursements; and

f.   any other just and equitable relief.

DATE: July __1__, 2011.

PARKER ROSEN, L.L.C.

By: _____

| | |
|---|---|
| Andrew D. Parker | Reg. No. 195042 |
| Daniel N. Rosen | Reg. No. 250909 |
| Daniel N. Lovejoy | Reg. No. 032646X |

300 First Avenue North, Suite 200
Minneapolis, Minnesota 55401
Telephone: (612) 767-3000
Fax:  (612) 767-3001


ALAN C. KAUFFMAN & ASSOC. PA

Alan C. Kauffman        Fla. No. 0495042
(Pro hac vice pending)
4400 North Federal Highway
Boca Raton, FL. 33432
Telephone: (561) 361-7500
Fax:  (561) 361-7827


ATTORNEYS FOR PLAINTIFFS