# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

File No.: 11:CV:1755 JRT/LIB

Northern Lakes Data Corp., and
Ashok Sinha,

Plaintiffs,

v.

ERRATA

Telvent GIT, S.A.;
Telvent USA Corporation;
BancPass, Incl; and
Glenn Deitiker, individually and as
an officer and representative of
Telvent USA Corporation and
Telvent GIT, S.A.,

Defendants.

---

**Pages 34 and 35 and Exhibits A, B, and C of the filed Complaint were inadvertently omitted due to an electronic scanning error.**

**The omitted pages are attached hereto.**

misleading, and disparaging statements influenced the purchasing decisions of actual and potential customers and consumers of Plaintiffs' products.

153.   Plaintiffs have been injured as a direct and proximate result of Defendants' conduct. Plaintiffs suffered injury to the goodwill and reputation that Plaintiff and its products enjoy with the buying public.

154.   The publication of these false and deceptive statements and representations and the other acts and conduct of Defendants as alleged above, constitutes a false and deceptive trade practice in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which caused substantial harm and damage to Plaintiffs' business and products.

155.   As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be established during the discovery period and proven at trial.

156.   Defendants deliberately, willfully, maliciously, and in bad faith committed the aforementioned violations of the Lanham Act.   The aforesaid conduct of Defendant constitutes an exceptional case under 15 U.S.C. § 1117(a). Plaintiffs are therefore entitled to recover enhanced damages and reasonable attorneys' fees incurred in this action.

## Count Fourteen – Defamation
## (Against All Defendants)

157.   Plaintiffs incorporate by reference hereto all allegations made in all preceding paragraphs of this Complaint as if fully set forth herein.

158.   Defendants made false statements and misrepresentations of and concerning Plaintiffs, including, but not limited to, communicating false and misleading statements about the business and reputation of Plaintiffs.

159.   Defendants' false statements and misrepresentations of and concerning Plaintiffs were published, disseminated, or otherwise communicated by Defendants.

160.   The aforementioned false statements and misrepresentations made by Defendants of and concerning Plaintiffs were of such a nature that they tended to harm Plaintiffs' reputation and lower them in the estimation of the community.

161.   Plaintiffs have been injured as a direct and proximate result of Defendants' conduct.

162.   As a result of Defendants' conduct, general damages may be presumed.   Plaintiff has also suffered additional damages in an amount to be established during the discovery period and proven at trial.

# TELVENT

February 1, 2009

Mr. Ashok Sinha
18280 Overland Trail
Eden Prairie, MN
55347-4191

Re:     Employment Post Closing with Telvent Farradyne Inc.

Dear Mr. Sinha,

The purpose of this letter is to confirm in writing the terms of your employment with Telvent Farradyne Inc. ("Telvent") from and after the closing (the "Closing") of the acquisition by Telvent of certain of the assets of Northern Lakes Data Corp. ("NLDC") in accordance with the terms of the Asset Purchase Agreement between Telvent and NLDC (the "APA") effective January 30, 2009. This Agreement shall become effective on the Closing. Any capitalized terms not defined herein shall have the meanings set forth in the APA.

Your position will be Vice President – Strategic Business Systems of Telvent. You will report to Larry Yermack, President of Telvent.

Responsibilities

As Vice President – Strategic Business Systems you will be responsible for managing the marketing, business development, sales and technology development activities of the new Strategic Business Systems division of Telvent. Your responsibilities will include:

1.      Sales of back-office and customer service center systems utilizing the TollPro Software or other software developed by the Strategic Business Systems division;

2.      Supporting projects which include the delivery of both electronic toll collection systems and the systems and software referred to in sub-paragraph 1 above;

3.      Development of new technology related to back-office and customer service center systems, in accordance with research and development budgets approved by the Board of Directors of Telvent; and

4.      Such other duties compatible with your position, as Telvent may reasonably require, including performing duties for affiliates of Telvent, including without limitation, Telvent Caseta, Inc.

During the term of your employment, you shall devote your business time and attention exclusively to Telvent and you shall not be employed in or engaged in promoting or carrying on any other business that is competitive with the business of Telvent, except as required under the Consulting Services Agreement between Telvent and NLDC to be executed and delivered on the Closing (the "Consulting Agreement").

1236899.6

Exhibit A

Employment Terms

1.   Term of Employment

Your employment with Telvent will continue through at least December 31, 2011 (the "Initial Term"), unless terminated sooner pursuant to the terms of this Agreement.  Thereafter, your employment with Telvent will be "at-will."

2.   Employment Compensation

Your salary will be $180,000 per annum ("Base Salary") and will be paid bi-weekly.  Your salary will be reviewed on an annual basis commencing in 2010 and your salary may be adjusted, but not decreased without your prior written consent. In addition, you will be entitled to participate in annual salary adjustments and in Telvent's variable compensation program applicable for senior executives of Telvent. After the last Consulting payment to NLDC and prior to January 1, 2012, Telvent and you will renegotiate in good faith an annual salary and compensation package commensurate with your title and authority within Telvent.

3.   Benefits and Employee Handbook

You will receive benefits according to the existing Telvent benefits plan as they may be discontinued, modified or replaced from time to time.  In addition, you will be subject to the Telvent Employee Handbook, which is a guide to the company's policies and procedures, as it may be amended from time to time.

4.   Paid Time Off

You will be entitled to 5 weeks of paid vacation annually.  Employees are required to take their annual vacation entitlement within the calendar year and with the approval of their direct manager. To encourage a healthy lifestyle, employees are not entitled to carry over any unused vacation time from one calendar year to another unless approved in writing in advance by the President.

In addition, you will receive 11 Company paid holidays per year.

5.   Company Travel and Business Expenses

It is recognized that, from time to time, you will be required to travel on company business. Telvent will reimburse all reasonable expenses incurred according to its travel policy. Telvent will pay or reimburse you for all reasonable out-of-pocket business expenses incurred by you in connection with the proper discharge of your duties under this Agreement.  All payments or reimbursements will be made upon submission of vouchers, bills or receipts for all such reasonable expenses.

6.   Confidential Information

Because of the sensitive nature of the leadership role that you will occupy and in recognition of your responsibilities to safeguard the Company's confidential information, you must execute and

comply with the terms of the Agreement Regarding Inventions & Confidential Information attached to this letter as Appendix "A".

7.     Non-Competition/Waiver of Rights

In the connection with the sale of business contemplated by the APA, and acknowledgement of the fact that in the course of performing your duties for Telvent, you will have access to Telvent's trade secrets and confidential and proprietary information, including business plans, financial information, customer lists, marketing and sales information, product lines, product development, and competitive information. In order to protect Telvent and such confidential and proprietary information, for a period one (1) year after the termination of your employment by Telvent for cause or by your voluntary resignation (other than resignation for Good Reason (as defined below) (the "Prohibition Period"), you will not (i) compete with Telvent or its affiliates or successors by engaging in a Competitive Business (as defined below) in the Restricted Area (as defined below) or (ii) induce or attempt to persuade any employee, consultant, agent or customer of Telvent to terminate such employment, consulting, agency or business relationship in order to enter into any such relationship with a Competitive Business. For purposes of this Agreement, engaging in a Competitive Business shall include direct or indirect competition as a sole proprietor, partner, corporate officer, director, shareholder, manager, member, employee, consultant, agent, independent contractor, trustee, or in any other manner in which such person holds any beneficial interest in a Competitive Business, derives any income from a Competitive Business, or provides any service to a Competitive Business; provided, however, that nothing contained herein shall be deemed to prohibit you from acquiring as an investment not more than one percent (1%) of the outstanding capital stock of a Competitive Business, whose capital stock is traded on a national securities exchange, NASDAQ or over-the-counter. For purposes of this Agreement, "Competitive Business" shall mean any business which is performed or engaged in by Telvent or in which Telvent is actively planning to become engaged in and of which you are aware as of the date your employment is terminated. For purposes of this Agreement, "Restricted Area" shall mean the United States and Canada.

During the Prohibition Period, you agree that you shall not take any action, or cause or assist any third party to take any action, to create or develop any Intellectual Property Rights or software, whether such Intellectual Property Rights or software is based on previous developments or future developments, that has functionality that is similar to the Software and/or Intellectual Property Rights Telvent acquired from NLDC pursuant to the APA. You hereby acknowledge and agree that, after giving affect to the APA and this Agreement, you have no rights in or to any of the Intellectual Property Rights or Software that are the subject of the APA.

You and Telvent acknowledge and agree that the restrictions set forth in this Section 7 shall not apply to, or otherwise restrict the ability of you or Northern Lakes Data Corp. to provide, services requested by Telvent or its affiliates pursuant to the Consulting Agreement.

In the event of any conflict between this paragraph and the terms of Section 5. (Non-Solicitation) of the Agreement Regarding Inventions & Confidential Information, the terms of this paragraph shall control.

8.    Company Policies

You agree to abide in all material respects by the policies of Telvent including, but not limited to, those in the Telvent Employee Handbook and the Agreement Regarding Inventions & Confidential Information as they exist now and as they are modified, terminated or replaced in the future. In the event such policies irreconcilably differ from the terms and conditions of this Agreement, the terms and conditions of this Agreement shall govern.

9.    Termination of Employment

In order to confirm continuity of personnel to the clients, you agree to give a minimum of one (1) months' notice to Telvent, subject to extension of up to three (3) months on mutual agreement of the parties, if you decide to resign from your employment other than for Good Reason (as defined below); provided, however, regardless of the length of any notice period, the period of your non-compete obligations set forth in paragraph 7 above shall commence on the date one (1) month from the date of such notice. This request is made in order to create a smooth transition for you, the clients, the management team and the employees. The Company may terminate your employment at any time for Cause (as defined below) or at any time after the Initial Term, in the latter case by giving you thirty (30) calendar days' written notice, subject to the severance provisions below.

If your employment with Telvent is terminated without Cause or if you resign from your employment with Telvent for Good Reason you will, unless such termination is in connection with your transition to employment by another member of the Telvent Group, (i.e. Telvent and all affiliates thereof) receive a severance payment of a lump sum cash payment equal to:

a.   Three (3) weeks current Base Salary for each completed or partial year of service with Telvent, provided that such payments will not be less than 9 months Base Salary, nor more than 12 months Base Salary (the "Severance Period").

b.   The amount of any accumulated unused vacation as of the date of the termination.

For purposes of this Agreement, **"Cause"** means you have:

(a)   engaged in fraud, embezzlement or theft;

(b)   made an unauthorized use or disclosure of confidential information or trade secrets to the material detriment of Telvent or any affiliate of Telvent;

(c)   been convicted of, or pleaded guilty or nolo contendere to, a felony or any crime involving dishonesty or moral turpitude;

(d)   taken actions in carrying out your duties, or failed to take actions, that constitute gross negligence or willful misconduct and have failed to promptly correct such actions or failure to take actions within a reasonable period of time given the nature of the action or failure to take action, but in no event less than ten (10) business days after receiving written notice from Telvent specifically describing the failure or conduct to be corrected;

(e)   failed to perform duties assigned to you for any reason other than illness or incapacity and have failed to promptly correct such failure or conduct within a reasonable period of time given the nature of the failure or conduct, but in no event less than 10 business days

after receiving written notice from Telvent specifically describing the failure or conduct to be corrected;

(f)     intentionally falsified records of Telvent, Telvent Caseta Inc. or any other affiliate of Telvent; or

(g)     breached any non-competition or non-solicitation covenant to which you are bound with respect to Telvent or any affiliate of Telvent, or materially breached the provisions of this Agreement.

For purposes of this Agreement, **"Good Reason"** means any one of the following events occurs without your consent on or after the date hereof and such event is not remedied or discontinued within 10 business days after you have given written notice to Telvent of such event, and you provide Telvent with written notice of your resignation within thirty (30) days of such occurrence:

(a)     any reduction of your then existing base salary by any material amount;

(b)     any requirement by Telvent that you relocate to a work site that would increase your one-way commute distance by more than seventy-five (75) miles from your then principal residence in Minnesota;

(c)     any material decrease in your title, responsibilities, authorities, powers or duties;

(d)     Telvent is in default of any material obligations under this Agreement.

10    **Choice of Laws and Venue.**

This Agreement is governed by the laws of the State of Minnesota without giving effect to any conflict of law provisions of such state. The parties hereto agree that any disputes arising out of this Agreement shall be litigated exclusively in courts located in Hennepin County, Minnesota.

It is a pleasure to provide you with this offer and we look forward to a long and rewarding association.

To accept this offer, please sign a duplicate copy of this Agreement and the Agreement Regarding Inventions & Confidential Information no later than [date].

Yours truly,

Telvent Farradyne Inc.

~~Barry Yermack~~        **CAMERON G. DEMCOE**
~~President~~            **Corporate Secretary**

Enclosures

Acceptance:

I accept the above terms of employment.

_____        2/2/09
Ashok Sinha                    Date

1236899.6

# Consulting Services Agreement

This Agreement is effective as of the 30th day of January, 2009.

Between:

Telvent Farradyne Inc.
3206 Tower Oaks Blvd,
Rockville, Maryland, 20852
("Telvent")

- and -

Northern Lakes Data Corp.
18280 Overland Trail
Eden Prairie, MN 55347-4191
(the "Contractor")

This Agreement Witnesses that in consideration of the mutual covenants and agreements of the parties contained herein, the parties agree as follows:

## Article 1 - The Services

1.1     Description of the Services

Telvent hereby retains Contractor to provide services to Telvent as more fully set forth below. Contractor shall be prepared to provide services (a) at the request of Contractor and (b) to the exclusion of other Contractor clients. The nature of the specific services to be performed by Contractor shall be subject to agreement of the parties as to the scope of services. The general type of services for which Contractor is being retained to provide is as follows:

Software research and development services including research of industry/client requirements for functionality enhancements, planning, design and project management and supervision of software development to be carried out by Telvent employees or contractors (the "General Services") and such other technical, software or maintenance services as may be requested by Telvent from time to time in support of specific software development and programming activities, Telvent bids, proposals, projects and customers involving TollPro and other back office and customer service center software as authorized by a purchase order issued by Telvent and signed by Contractor (the "Additional Services"). The General Services and the Additional Services are hereinafter referred to collectively as the "Services".

1.2     Standards

Contractor represents and warrants to Telvent that Contractor has the skills required to perform the Services. Contractor agrees to perform the Services to the best of Contractor's ability in accordance with generally recognized business and professional standards. In performing the Services, Contractor shall observe and obey all applicable laws, regulations, rules and standards imposed by any government or regulatory body with jurisdiction.

1.3     Key Personnel.

Contractor shall use reasonable commercial efforts to hire and retain the persons whose names and positions are set out below (the "Key Personnel"). Contractor shall assign the Key Personnel to the performance of the Services. Contractor shall not, without Telvent's prior written consent, change the Key Personnel for the performance of the Services.

| Name | Position | Responsibilities |
|------|----------|------------------|
| Ashok Sinha | | General Services |
| Ramana Garaga | | Additional Services |
| Jaspal Johar | | Additional Services |

Contractor agrees that Telvent may, if it so elects, engage or hire any of the employees or sub-consultants of Contractor performing the Services under this Agreement. In the event that Telvent engages or hires either of Ramana Garaga or Jaspal Johar, Telvent will make them available to perform services for Contractor at the rates set out in section 4.2 of this Agreement or at Telvent's cost, whichever is higher, for the limited purposes described in section 11.3 of the Asset Purchase Agreement between Telvent and Contractor dated effective as of January 30, 2009 (the "APA").

## Article 2 - Term

2.1   Contractor shall be available to provide, and shall provide the Services as requested and agreed, for a period (the "Term") commencing on the 30th day of January, 2009 and ending on the 31st day of December, 2011.

## Article 3 - Independent Contactor

3.1   In performing the Services hereunder, Contractor shall be an independent contractor and neither Contractor nor its employees, agents, sub-consultants or subcontractors shall be deemed to be employees, agents, sub-consultants or subcontractors of Telvent, notwithstanding that the performance of the Services or any part hereof may be subject to direction of Telvent. In performing the Services hereunder neither Contractor nor its employees, agents, sub-consultants or subcontractors shall receive the benefits received by Telvent's employees. Contractor agrees to be responsible for all claims and payments and filings with respect to income tax, pension payments, unemployment insurance payments and workers' compensation payments and benefits which may arise out of the Services to be provided under this Agreement and Telvent shall not be required to make any contributions in respect of any of the foregoing. Contractor shall indemnify Telvent against any claims made against Telvent in respect of any of the foregoing.

## Article 4 - Compensation

4.1   Fees for the General Services

Telvent shall pay the following compensation to the Contractor for maintaining its availability to perform the General Services on request of Telvent and for performing agreed upon General Services:

(a)   Fixed R&D Payments.

Telvent will pay $2,000,000 for the General Services by installments as set out below (the "Fixed R&D Payments"):

| July 1, 2009 | $500,000 |
| January 8, 2010 | $500,000 |
| July 1, 2010 | $500,000 |
| January 7, 2011 | $500,000 |
| | |

The Fixed R&D Payments will be due to Contractor regardless of whether Contractor is ever requested to perform any Services hereunder, whether this Agreement is terminated prior to December 31, 2011 and regardless of the reason for termination or the employment status of Ashok Sinha with Telvent.

If prior to December 31, 2010, Telvent is awarded a contract for the supply, programming, installation, testing and commissioning of a back office and customer service center system using the TollPro software as a result of a bid or proposal submitted by Telvent using the E-470 system as a reference, the Fixed R&D Payments will be increased by $250,000 which will be paid on July 1, 2011.

If prior to December 31, 2010, Telvent signs an agreement with the Colorado E-470 Public Highway Authority, satisfactory to Telvent to replace the existing Software License Agreement dated February 18, 2004 and the Agreement for Consulting Services (On Call Services) dated March 9, 2007 entered into between Contractor and the Colorado E-470 Public Highway Authority ("E-470") with a new agreement for the provision of technical and maintenance services by Telvent and which confirms that E-470 is not entitled to sell the E-470 Works as defined in the said Software License Agreement or license either the "Software" as defined in the said License or the E-470 Works to any person, firm, corporation or other entity which is a competitor of Telvent, the Fixed R&D Payments will be increased by $250,000 which will be paid on July 1, 2011.

(b)   Incentive R&D Payments.

Telvent will also pay variable payments to Contractor for the General Services (the "Incentive R&D Payments"), calculated as follows:

(i)   2% of all Qualifying Revenue (as defined in paragraph (c) below) received by Telvent under SBS Contracts (as defined below); and

(ii)   2% of all Qualifying Revenue received by Telvent under Tail Period SBS Contracts.

(c)   Definitions

(i)   The term "SBS Contracts" means contracts, purchase orders, service orders and change orders entered into by either Telvent or Telvent Caseta, Inc. or their respective successors and/or assigns for:

(A)   back-office and customer service center systems utilizing the TollPro Software or other software developed by the Strategic Business Systems business unit of Telvent and associated services, including but not limited to systems integration and software development related to the said systems;

(B)     projects which include the delivery of both electronic toll collection systems and the systems and software referred to in sub-paragraph (A) above; and

(C)     new technology related to back-office and customer service center systems which is developed by the Strategic Business Systems business unit , including for example, the development of software and systems for financial transactions processing for toll road authorities;

(D)     systems and technology identified in and developed in accordance with subparagraphs (A) through (C) above that have their genesis in Software and Other Seller Software, as those terms are defined in the APA;

other than any such contracts, purchase orders, service orders or change orders which are related to the SR-91 and E-470 toll roads, which are fully executed by both Telvent (or Telvent Caseta, Inc.) or their respective successors and/or assigns and the client during the period from the Closing through December 31, 2012.

(ii)     The term "Tail Period SBS Contracts" means contracts, purchase orders, service orders and change orders entered into by either Telvent or Telvent Caseta, Inc. or their respective successors and/or assigns for:

(A)     back-office and customer service center systems utilizing the TollPro Software or other software developed by the Strategic Business Systems business unit of Telvent and associated services including but not limited to systems integration and software development related to the said systems;

(B)     projects which inclde the delivery of both electronic toll collection systems and the systems and software referred to in sub-paragraph (A) above; and

(C)     new technology related to back-office and customer service center systems which is developed by the Strategic Business Systems business unit , including for example, the development of software and systems for financial transactions processing for toll road authorities;

(D)     systems and technology identified in and developed in accordance with subparagraphs (A) through (C) above that have their genesis in Software and Other Seller Software, as those terms are defined in the APA;

other than any such contracts, purchase orders, service orders or change orders which are related to the SR-91 and E-470 toll roads, which are fully executed by both Telvent or Telvent Caseta, Inc. or their respective successors and/or assigns and the client during the 6 month period from January 1, 2013 to June 30, 2013 with respect to requests for proposals and projects for which Telvent submitted a proposal and was short-listed by the client prior to December 31, 2012.

(iii)     The term "Qualifying Revenue" means that portion of the payments received by Telvent from the clients under SBS Contracts and Tail Period SBS Contracts which relate to the software, systems and services described in sub-paragraphs (i) and (ii) above.   Revenues received with respect to any portion of SBS Contracts and Tail Period SBS Contracts which does not involve the systems, software or services described in sub-paragraphs (i) and (ii) above shall not be included in Qualifying Revenue.

(d)     The amount of any Incentive R&D Payments, if any, owing to Contractor shall be calculated and payable by Telvent within 30 days after each fiscal quarter ending after the Closing.

(e)     Telvent will continue to calculate and make the Incentive R&D Payments until: (i) all amounts owing to Telvent in respect of SBS Bookings and Tail Period SBS Bookings have been received by Telvent or Telvent Caseta, Inc., or their respective successors and/or assigns, as the case may be, including payments received after December 31, 2012; or (ii) until Contractor has received a total of $5,0000,000 in Incentive R&D Payments, whichever occurs first.

(f)     To be included in the calculation of R&D Incentive Payments, the terms and conditions of the applicable contracts must be in accordance with Telvent contracting policies and business practices.

(g)     In the event that Sinha's employment with Telvent terminates for any reason (including voluntary resignation by Sinha), Telvent will continue to pay Contractor the Incentive R&D Payments for SBS Bookings and Tail Period SBS Bookings signed before the date of termination.

4.2     Fees for Additional Services.

Unless otherwise agreed in the purchase order, Telvent shall pay Contractor for the performance of the Additional Services consulting fees in the amount of US$73 per hour for Ramana Garaga and US$70 per hour for Jaspal Johar. For other Contractor personnel, the hourly rate shall be agreed upon in the purchase order for the specific Additional Services.

4.3     Equipment and Resources.
Telvent will provide Contractor with such equipment, personnel and resources (at no cost to Contractor) as may be reasonably requested by Contractor to fulfill its obligation to provide Services.

4.4     Out of Pocket Expenses .
Telvent will reimburse Contractor for all reasonable out of pocket expenses incurred by Contractor while providing any Services at the request of Telvent away from Telvent's facilities in Denver in the case of Contractor's sub-consultants or employees based in Denver or away from Minneapolis in the case of Ashok Sinha.

4.5     Benefits
Neither Contractor nor any employees, agents, sub-consultants or subcontractors of Contractor are eligible to receive any of the benefits that Telvent provides for its employees, including without limitation, vacation and general holiday pay, sick leave, and social security and unemployment insurance contributions made by Telvent on behalf of its employees.

4.6     Set-off
In the event that Telvent has notified Contractor of a good faith claim by Telvent for indemnity pursuant to the provisions of Article 12 of the Asset Purchase Agreement between Telvent and Contractor dated January 30, 2009 (the "APA"), Telvent shall have the right to retain out of any payments for the General Services due or to become due to Contractor hereunder an amount equal to Telvent's reasonable estimate of the amount of such claim (up to an amount equal to the limit of Contractor's liability under the APA ) less any amounts payable to Contractor under the

APA, until Telvent's claim for indemnity has been settled by agreement between the parties or determined by an order of a court of competent jurisdiction or arbitrator.

## Article 5 - Confidentiality

5.1     Confidential Information

"Confidential Information" means all data and information relating to the business and management of Telvent, including without limitation, patents, inventions, secret processes, production methods, marketing information (including price lists, installation lists, customer lists, quotations, purchasing methods, etc.), systems design, programming and engineering information (whether in the form of specifications, drawings, descriptions, software listings, and/or software media) computer programs, source code, data, software modules and related documentation, know-how, financial information, business plans and other proprietary information, trade secrets, technology and accounting records of Telvent and Telvent's customers, business partners and suppliers, to which access is obtained by Contractor in connection with this Agreement and the performance of the Services.

5.2     Ownership

Contractor acknowledges that all Confidential Information received from Telvent is and shall be the sole and exclusive property of Telvent or its designee. Contractor shall not acquire any right, title or interest in and to any of the Confidential Information.

5.3     Limited Disclosure and Reproduction

Contractor shall keep all Confidential Information strictly confidential and take all necessary precautions to prevent unauthorized disclosure of the Confidential Information during the Term of this Agreement and thereafter. Contractor shall not disclose, or allow access to, the Confidential Information to any third party, without Telvent's prior consent in writing, nor will Contractor copy or reproduce the Confidential Information, except as may reasonably be required to perform the Services.

5.4     Limited Use

Contractor shall not use any Confidential Information for Contractor's own or any other purposes, except for purposes related to the performance of the Services. In particular, Contractor shall not use any of the Confidential Information for creating, maintaining or marketing any computer program or software which is competitive with any computer program owned or developed by Telvent.

5.5     Indemnity

Contractor agrees to indemnify Telvent for all damages, costs, and expenses (including court costs and reasonable attorney fees) incurred by Telvent as a result of a failure of Contractor to comply with Contractor's obligations under this Article 5. This Article shall survive the termination of this Agreement.

5.6     Return of Information

Contractor, upon request by Telvent and in any event upon the termination of this Agreement, shall immediately return to Telvent the Confidential Information and all copies thereof in any form whatsoever which are in the possession, charge, control or custody of Contractor, together with all other equipment or information provided to Contractor by Telvent during the Term hereof.

5.7     No Breach of Other Obligations

Contractor acknowledges and represents to Telvent that Contractor's performance as a consultant of Telvent shall not breach any agreement to keep confidential the proprietary or confidential information of any prior client of Contractor or any other third party.   Contractor also acknowledges and represents to Telvent that Contractor has not brought to Telvent, and shall not use in the performance of its work with Telvent, any proprietary or confidential materials or documents of any former client of Contractor or other third party.   Contractor further acknowledges and represents that it is not a party to any agreement or obligation with any third party which conflicts with any obligations of Contractor under this Agreement.

5.8     Exclusions

The obligations of Contractor under this Article shall not apply to Confidential Information which:

(a)     is or becomes publicly available through no fault of Contractor;

(b)     is already in the rightful possession of Contractor prior to its receipt from the Telvent and without any obligation of confidentiality;

(c)     can be demonstrated by written records was independently developed by Contractor without reference to any of the Confidential Information of Telvent;

(d)     is rightfully obtained by Contractor from a third party without any obligation of confidentiality.

5.9     Publicity

Contractor shall not use Telvent's name in any advertising, promotional material or publicity release relating in any way to the Services without the prior written consent of Telvent.

Article 6 - Ownership of Developments

6.1     Contractor agrees that all inventions, improvements, discoveries, developments, computer software, source code, functionality, and documentation and other works of authorship, whether protectable by patent, copyright, trademark, mask work right, industrial design, trade secret or other intellectual property protection mechanism, which are written, conceived or developed by Contractor either alone or jointly with others during the performance of the Services ("Developments") shall be the sole property of Telvent and shall be promptly disclosed to Telvent.   Contractor shall assign to Telvent all of Contractor's right, title and interest in each of the Developments. Contractor shall ensure that Telvent is provided with a copy of all working papers, notes and memoranda which are made or obtained in relation to any Developments.

Article 7 - Termination of Agreement

7.1     Termination For Cause

If Contractor defaults in performing any of the material obligations in this Agreement, Telvent shall give written notice of default to Contractor stating the details of the default.   If Contractor does not remedy of the default within the 20 days of receiving the notice of default, Telvent may terminate this Agreement.

7.2     Waiver of Damages

Any claims for damages by Contractor on account of such termination including, without limitation, all claims for loss of anticipated profit, consequential, incidental or punitive damages,

are hereby waived by Contractor and the sole remedy for such termination shall be to continue to receive all amounts not previously paid to Contractor under this Agreement on the timetable set forth above.

Neither party hereto will be liable to the other hereunder for any punitive, consequential or incidental damages (including loss of revenue or income, business interruption, cost of capital or loss of business reputation or opportunity) relating to any claim for which either such party may be entitled to recover under this Agreement (other than indemnification of amounts paid or payable to third parties in respect of any third party claim for which indemnification hereunder is required).

## Article 8 - Changes

8.1   Any changes to the provisions hereof shall only be made by means of an agreement or other memorandum in writing duly executed by Telvent and Contractor.

## Article 9 - Assignment

9.1   This Agreement shall not be assigned or subcontracted by Contractor without prior written consent of Telvent, which consent may be arbitrarily withheld.

## Article 10 - Notices

10.1   Any notice or other communication to be made or given in connection with this Agreement shall be made or given in writing and may be made or given either by personal delivery or by facsimile transmission.

|   | |
|---|---|
| To Telvent: | Telvent Farradyne Inc. |
| | 3206 Tower Oaks Blvd, |
| | Rockville, Maryland, 20852 |
| | Phone: |
| | Fax: |

To Contractor:  Northern Lakes Data Corp.
                18280 Overland Trail
                Eden Prairie, MN 55347-4191
                Phone: (952) 828 0937
                Fax: (952) 828 1904

All notices under this Agreement shall be deemed duly given upon delivery if personally delivered or on receipt if sent by electronic means.

## Article 11 - General Terms

11.1   This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota excluding the conflicts of law provisions thereof.

11.2   If any provisions of this Agreement are invalid under any applicable statute or rule of law, they

are, to that extent, omitted, but the remainder of this Agreement shall continue to be binding upon the parties hereto.

11.3     The division of this Agreement into Articles and Sections and the insertion of headings are for the convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "this Agreement", "hereof", "hereunder" and similar expressions refer to this Agreement or instrument supplemental or ancillary hereto. Unless something in the subject matter or context is inconsistent therewith, references herein to Articles and Sections are to Articles and Sections to this Agreement.

11.4     This Agreement shall ensure to the benefit of and be binding upon the successors and permitted assigns of Contractor and Telvent respectively.

11.5     All capitalized terms not otherwise specifically defined in this Agreement shall have the meaning set forth in that certain Asset Purchase Agreement between the parties of even date herewith.

*Signature page follows*

In Witness Whereof, each of the parties hereto has caused this Agreement to be executed on its behalf.

Telvent Farradyne Inc.                          Northern Lakes Data Corp.

By: _____                     per: _____

Name: **CAMERON G. DEMCOE**                      Name: _____ASHOK  SINHA_____

Title: **Corporate Secretary**                   Title: _____PRESIDENT_____

Date: ____Feb 2, 2009_____                     Date: ____2/2/09_____

Execution

Asset Purchase Agreement
Between

Northern Lakes Data Corp.

and

Telvent Farradyne Inc.

Effective As Of

January 30, 2009

Exhibit C

Exhibits ........................................................................................................................ iii
Schedules ..................................................................................................................... iii
Article 1 - Interpretation ............................................................................................. 1
   1.1     Definitions. ...................................................................................................... 1
Article 2 - Purchase and Sale of Assets. ..................................................................... 4
   2.1     Purchase and Sale of Assets. .......................................................................... 4
   2.2     Excluded Assets. ............................................................................................. 4
   2.3     Adjustment ...................................................................................................... 5
Article 3 — Assigned Contracts .................................................................................. 5
   3.1     Enumeration of Assumed Obligations. ........................................................... 5
   3.2     Liabilities Not Assumed. ................................................................................. 5
Article 4 - Price and Payment ..................................................................................... 6
   4.1     Purchase Price. ................................................................................................ 6
Article 5 - Representations and Warranties of Seller. .................................................. 7
   5.1     Organization. ................................................................................................... 7
   5.2     Power and Authority. ...................................................................................... 7
   5.3     No Conflict. ..................................................................................................... 7
   5.4     Government Consents. ..................................................................................... 7
   5.5     Required Contract Consents. ........................................................................... 8
   5.6     Customer Contract .......................................................................................... 8
   5.7     Title to Assets. ................................................................................................ 8
   5.8     Condition of Property. ..................................................................................... 8
   5.9     Software. .......................................................................................................... 8
     (a)    Intellectual Property Owned by Seller. ........................................................ 8
     (b)    Intellectual Property Used by Seller. ............................................................ 9
     (c)    Other Seller Software. ................................................................................... 9
   5.10    Litigation. ...................................................................................................... 10
   5.11    Court Orders, Decrees, and Laws. ................................................................ 10
   5.12    Personnel and Compensation. ....................................................................... 10
   5.13    Broker's or Finder's Fees. .............................................................................. 10
   5.14    Previous Deliveries. ...................................................................................... 10
   5.15    Leased Real Property. .................................................................................... 10
   5.16    Truth at Closing. ........................................................................................... 11
Article 6 - Representations and Warranties of Buyer .................................................. 11
   6.1     Organization. ................................................................................................. 11
   6.2     Power and Authority. .................................................................................... 11
   6.3     Broker's or Finder's Fees. .............................................................................. 11
   6.4     No Conflict. ................................................................................................... 11
   6.5     Government Consents. ................................................................................... 12
Article 7 - Conditions to Seller's Obligations ............................................................ 12
   7.1     Representations and Warranties True at Closing Date. ................................. 12
   7.2     Litigation. ...................................................................................................... 12
Article 8 - Conditions to Buyer's Obligations. ........................................................... 12
Article 9 - Pre-Closing Covenants of Seller and Buyer. ............................................ 13
   9.1     Conduct Pending Closing. ............................................................................. 13
   9.2     Consents. ....................................................................................................... 13
   9.3     Bulk Sales Laws. ........................................................................................... 13
   9.4     Exclusive Dealing. ........................................................................................ 14
   9.5     Access. .......................................................................................................... 14
   9.6     Notification. ................................................................................................... 14

9.7    [Reserved] ...................................................................................................14
9.8    Hiring of Contractors. ....................................................................................15
Article 10 - Closing..................................................................................................15
10.1   Closing. .........................................................................................................15
10.2   Actions at Closing. ........................................................................................15
10.3   Further Assurances. .......................................................................................16
10.4   Allocation of Purchase Price. ........................................................................16
Article 11 - Covenants of Seller and Buyer Following Closing ....................................16
11.1   Transfer Taxes. ..............................................................................................16
11.2   Non-Compete. ...............................................................................................16
11.3   Temporary License with respect to E-470 ....................................................17
11.4   Right of First Refusal for Seller's Interest in the E-470 Works .....................17
11.5   Licenses for the E-470 Works ......................................................................18
Article 12 - Indemnity...............................................................................................18
12.1   Indemnification by Seller. .............................................................................18
12.2   Indemnification by Buyer. .............................................................................19
12.3   Notice of Claim. ............................................................................................19
12.4   Defense. ........................................................................................................19
12.5   Time of Assertion. .........................................................................................20
12.6   Limitation on Indemnity Obligations. ...........................................................20
Article 13 - Termination Prior to Closing .................................................................21
13.1   Termination of Agreement. ............................................................................21
13.2   Termination of Obligations. ..........................................................................21
Article 14 - Miscellaneous........................................................................................21
14.1   Entire Agreement. ..........................................................................................21
14.2   Parties Bound by Agreement; Successors and Assigns. ................................22
14.3   Waiver. ..........................................................................................................22
14.4   Expenses.......................................................................................................22
14.5   Notices. .........................................................................................................22
14.6   Governing Law..............................................................................................23
14.7   Public Announcements...................................................................................23
14.8   Third-Party Beneficiaries..............................................................................23
14.9   Survival of Agreements..................................................................................23
14.10  Access to Information. ...................................................................................24
Exhibit "A" – Listed Assets ........................................................................................1
Exhibit "B" - Description of Customer Contract...........................................................1
Exhibit "C" - Description of the TollPro Software.........................................................1
Exhibit "D" – Form of Employment Agreement ...........................................................1
Exhibit "E" – Waiver Agreement..................................................................................1
Exhibit "F" – Form of Bill of Sale ...............................................................................1
Exhibit "G" – Form of Assignment of Customer Contract ............................................1
Exhibit "H" – Form of Assignment and Assumption Agreement ...................................1
Exhibit "I" – Form of Intellectual Property Assignment ...............................................1
Exhibit "J" – Form of Consulting Agreement................................................................1
Exhibit "K" -- Allocation of Purchase Price .................................................................1

Exhibits

Exhibit "A"        Listed Assets
Exhibit "B"        Description of Customer Contract
Exhibit "C"        Description of TollPro Software
Exhibit "D"        Form of Employment Agreement
Exhibit "E"        Form of Waiver Agreement
Exhibit "F"        Form of Bill of Sale
Exhibit "G"        Form of Assignment of Customer Contract
Exhibit "H"        Form of Assignment and Assumption Agreement
Exhibit "I"        Form of Intellectual Property Assignment
Exhibit "J"        Form of Consulting Services Agreement
Exhibit "K"        Purchase Price Allocation

Schedules

Schedule 2.1(j)        Outstanding Bids and Proposals
Schedule 3.1(b)        Non-Assignable Bids and Proposals
Schedule 5.6(c)        Fixed Price Customer Purchase or Work Orders
Schedule 5.9(a)(1)     Registered Intellectual Property Rights
Schedule 5.9(a)(3)     Proceedings and Claims With Respect to Intellectual Property Rights
Schedule 5.9(a)(7)     Infringement of Third-Party Rights
Schedule 5.9(b)(1)     Inbound Licenses
Schedule 5.10          Litigation
Schedule 5.11          Court Orders, Decrees, and Laws
Schedule 5.13          Brokers and Finders
Schedule 5.15          Copy of Denver Office Lease

## Asset Purchase Agreement

This Asset Purchase Agreement is effective as of the 30th day of January, 2009, between:

Northern Lakes Data Corp.
("Seller"),

and

Telvent Farradyne Inc.
("Buyer").

Whereas:

A.    The Seller is engaged in a business (the "Business") consisting of the marketing, development and delivery of back office customer service center and violations processing systems to the electronic toll collection (ETC) industry;

B.    Seller desires to sell to Buyer, and Buyer desires to buy from Seller, certain of the assets of Seller used in the Business, and a certain customer contract of Seller, all upon the terms and conditions set forth herein.

Now, Therefore, in consideration of the mutual representations, warranties and agreements of the parties hereinafter set forth, the parties hereby agree as follows:

### Article 1 - Interpretation

1.1    Definitions.

In this Agreement, the following terms shall have the following meanings:

"Accounts Receivable" means the accounts receivable of Seller relating to the Customer Contract outstanding as of the Closing Date.

"Assets" means the assets of the Business to be acquired by Buyer under this Agreement as described in Article 2.1 and Exhibits "A", "B" and "C".

"Assigned Contracts" means the Customer Contract and the Denver Office Lease.

"Assumed Obligations" means the obligations of Seller specifically identified in Article 3.1 to be assumed by Buyer subject to the terms and conditions of this Agreement, and no other obligations liabilities or amounts of any kind.

"Business" has the meaning defined in the recitals to this Agreement.

"Business Records" means copies of:
(1)    all business, accounting and operating records relating to the Customer Contract;
(2)    all documentation related to the Software;
(3)    the records for the personnel and consultants of Seller who will be offered employment  or retained by Buyer;

(4)     customer lists, prospects lists, supplier lists; and

(5)     sales and marketing information, materials and brochures related to the Software.

"Customer Contract" means the contract of the Seller described in Exhibit "B".

"Closing" means the completion of the sale and purchase of the Assets, the assignment and assumption of the Assigned Contracts and the performance of the other obligations required to be performed at Closing, all in accordance with this Agreement.

"Closing Date" means the date established by the parties for the Closing which shall be a date to be mutually agreed to by the Parties.

"Computer Equipment" means the computer equipment listed in Exhibit "A" used by Seller for development and maintenance of the Software including the licenses for all third party programs, tools, utilities, compilers and other software installed or used on such equipment and Seller's rights under all related warranties.

"Denver Office Lease" means the Lease Agreement, dated September 13, 2006, between Seller and BGK Central Aurora Operating Associates, Limited Partnership ("Landlord"), a New Mexico limited partnership for the premises known as Suite 210, 13800 East Harvard Avenue, Aurora, Colorado.

"E-470" means the Colorado E-470 Public Highway Authority.

"E-470 Agreements" means all agreements between Seller and E-470 Public Highway Authority, including without limitation, the Software License Agreement dated February 18, 2004, the Agreement for Consulting Services dated May 5, 2005 and the Agreement for Consulting Services (On Call Services) dated March 9, 2007.

"E-470 Works" means the software defined as the "E-470 Works" in the Software License Agreement between Seller and E-470 dated February 18, 2004.

"Effective Date" means January 30, 2009.

"Jointly Owned Software" means the software jointly owned by Seller and TransCore LP which was developed and delivered by Seller under the Master Subcontract Agreement ZH810212 between Seller and TransCore LP and the Statements of Work issued thereunder, including without limitation, Statement of Work ZH810212A for a project in Dubai.

The term "Jointly Owned Software" includes:

- all Intellectual Property Rights in and to the Jointly Owned Software; and
- all object code, source code, listings, sequence, logic structure, screens and all technical documentation, working notes and papers relating to such Jointly Owned Software;

"Intellectual Property Rights" means all copyrights, patents, and trademarks (including registrations, licenses, and applications pertaining thereto), and all other intellectual property rights, trade secrets, and other proprietary information or rights.

"Key Consultants" means Ramana Garaga, Jaspal Singh Johr, Carl Fox, Mike Kraemer and Michael Stewart.

"Listed Assets" means the assets listed in Exhibit "A".

"Other Seller Software" means back office customer service center and violations processing systems software developed by Seller prior to the Closing Date, but specifically excluding the TollPro Software and the Jointly Owned Software.  The term "Other Seller Software" includes:

- all Intellectual Property Rights in and to the Other Seller Software;
- all object code, source code, listings, sequence, logic structure, screens and all technical documentation, working notes and papers relating to the Other Seller Software;
- all internal training, operation and development manuals pertaining to the Other Seller Software for all versions;
- all customer training materials, operation and user guides for all versions of the Other Seller Software;
- all programs, tools, utilities and interfaces owned by Seller and used for the development, maintenance and implementation of such Other Seller Software; and
- all promotional and marketing materials for such Other Seller Software.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other entity, or a governmental entity (or any department, agency, or political subdivision thereof).

"Required Contract Consents" means all approvals or consents necessary for the assignment to Buyer of the Customer Contract to be delivered at Closing and the Denver Office Lease to be delivered post-closing.

"Software" means the TollPro Software and the Seller's interest in the Jointly Owned Software.

"TollPro Software" means:

(a)    the back office customer service center and violations processing systems software developed by Seller for use under the contract with the Colorado E-470 Public Highway Authority ("E-470"), as described in Exhibit "C", but specifically excluding the software defined as the "E-470 Works" in the Software License Agreement between Seller and E-470 dated February 18, 2004;

(b)    the back office customer service center and violations processing systems software delivered by Seller to California Private Transportation Authority and Orange County Transportation Authority for the SR-91 toll system.

The term "TollPro Software" includes:

- all Intellectual Property Rights in and to the TollPro Software;
- all object code, source code, listings, sequence, logic structure, screens and all technical documentation, working notes and papers relating to the TollPro Software;
- all internal training, operation and development manuals pertaining to the TollPro Software for all versions;
- all customer training materials, operation and user guides for all versions of the TollPro Software;
- all programs, tools, utilities and interfaces owned by Seller and used for the development, maintenance and implementation of such TollPro Software; and
- all promotional and marketing materials for such TollPro Software.

The term "TollPro Software" specifically excludes the Jointly Owned Software and the Other Seller Software.

"Transaction Documents" means this Agreement, the Employment Agreement to be entered into by Ashok Sinha and Buyer and all of the other documents to be delivered by the Parties at Closing in accordance with Article 10.2.


Article 2 - Purchase and Sale of Assets

2.1     Purchase and Sale of Assets.

Upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase and Seller agrees to sell, transfer and deliver to Buyer, at the Closing and effective as of the Effective Date, all right, title, and interest of Seller in and to the following assets used in the Business (hereinafter collectively referred to as the "Assets"):

(a)     the Listed Assets;

(b)     the TollPro Software (subject to the temporary license described in section 11.3);

(c)     Seller's interest in the Jointly Owned Software;

(d)     Seller's interest in Other Seller Software;

(e)     all Intellectual Property Rights in and to the name and trademark "TollPro", including all registrations, renewals, registration rights and related applications, together with all goodwill related thereto;

(f)     the Customer Contract including all Seller's work in progress;

(g)     all of Seller's right, title and interest under the Denver Office Lease, including any prepayments of rent or security deposits;

(h)     all of Seller's right, title and interest under the Services Agreement;

(i)     all deposits, prepayments and invoices (or portions of invoices) for work that, as of the Closing Date, has not been performed by Seller;

(j)     all of Seller's rights and benefits under any bids, tenders or proposals which have been submitted by Seller and are still pending (to the extent assignable), as set forth in Schedule 2.1(j); and

(k)     the Business Records.

2.2     Excluded Assets.

Notwithstanding the provisions of Section 2.1, the Assets will not include any assets not specifically enumerated in Section 2.1, including, without limitation, any of the following assets, rights or properties (collectively, the "Excluded Assets"):

(a)     any cash of the Seller, including all bank accounts;

(b)     any rights or claims of the Seller with respect to any tax refund, carry-back or carry-forward or other credits to the Seller for periods ending prior to the Closing Date;

(c)     any property, casualty, workers' compensation or other insurance policy relating to the Seller, and any rights and claims of the Seller under any such insurance policy, including, but not limited to, rights to any cancellation value;

(d)     the Accounts Receivable (other than invoices or portions of invoices referred to in Section 2.1(h), above);

(e)     any claim, cause of action, suit, judgment, demand or right of any nature against third parties to the extent not relating to the Customer Contract or the Assets and the documents and records relating thereto; and

(f)     the E-470 Agreements and the E-470 Works.

2.3     Adjustment

(a)     The parties agree to pro rate any outstanding receivables, payables, work orders and invoices to reflect the actual work performed by Seller prior to Closing for which (a) Seller shall receive payment and for which (b) Seller will be obligated to pay outstanding amounts.

(b)     In the event the Closing does not occur on or before February 1, 2009, Buyer (on behalf of Seller) shall pay the monthly lease amount due on February 1, 2009 under the Denver Office Lease. In the event the Closing does not occur for reasons not attributable to Buyer, Seller shall reimburse Buyer for the monthly lease amounts paid by Buyer relating to the Denver Office Lease.

## Article 3 -- Assigned Contracts

3.1     Enumeration of Assumed Obligations.

Except for the Assumed Obligations, Buyer is not assuming any of the liabilities or obligations of Seller generally pertaining to the Business. At and after the Closing, Buyer shall assume and perform only the obligations of Seller specifically identified below to the extent stated:

(a)     The obligations of Seller under the Customer Contract and the Denver Office Lease (other than the liabilities excluded under Section 3.2, below); and

(b)     Bids, tenders and/or proposals submitted by Seller prior to Closing, which are not assignable to Buyer, as set forth on Schedule 3.1(b).

3.2     Liabilities Not Assumed.

All obligations and liabilities of Seller not specifically identified in Article 3.1 are not assumed by Buyer. Instead, the Seller shall remain fully liable therefore and shall indemnify and hold Buyer and its affiliates harmless from the same, in accordance with the provisions of Section 12.1 below. For greater certainty and without limiting the generality of the foregoing, the following liabilities and obligations of Seller are not assumed by Buyer:

(a)     Any liability of Seller arising out of any action or omission by the Seller prior to the Closing Date or any non-compliance, breach or default under any of the Assigned Contracts existing as of the Closing Date.

(b)     Any liability or obligation of Seller for foreign or United States federal, state, or local income, franchise, property, sales or use, or recapture taxes, assessments, and penalties, whether arising

out of the transactions contemplated by this Agreement or out of the conduct of the Business prior to the Closing Date.

(c)     Any liability or obligation resulting from violations of any applicable laws or regulations by Seller or infringement of third-party rights or interests prior to the Closing Date.

(d)     Any employee liabilities relating to present and past employees of Seller with respect to Seller's plans, programs, policies, commitments, and other benefit entitlements established or existing on or prior to Closing (whether or not such liabilities are accrued or payable at Closing, and whether or not such liabilities are contingent in nature), including:

(1)     Any liability or obligation for workers' compensation.

(2)     Any current or future liabilities to employees retiring on, before, or after Closing, and their dependents for benefits that may have been accrued or earned by any employees associated with the Business on or before Closing.

(3)     Any current or future liabilities for benefits that may have been accrued or earned by any employees associated with the Business on or before Closing under any pension plans relating to service prior to the Effective Date.

(4)     Any current or future liabilities for claims incurred prior to Closing and related expenses with respect to any employees associated with the Business under any welfare or disability plans established or existing at or prior to Closing, regardless of when filed with Buyer, Seller, or the claims administrator for any such plan.

(5)     Any retrospective premium on pension, savings, thrift, or profit-sharing plan contribution relating to any employees associated with the Business incurred or accrued prior to the Effective Date, regardless of when invoiced or recorded.

(6)     Any monetary liability for severance payments that may arise at any time in favor of any of Seller's employees under any plan, program, policy, commitment, or other benefit entitlement and relating to Seller's employment of such employees.

(e)     Any liability or obligation for product liability damage claims arising out of defects in or failures of the Software or any other product, program or materials provided, distributed, licensed, or delivered by Seller or any agent, reseller or distributor of Seller prior to the Closing Date.

(f)     Any litigation pending or threatened against Seller or the Assets.

(g)     The liabilities and obligations of Seller under the E-470 Agreements.


Article 4 - Price and Payment

4.1     Purchase Price.

Unless a right of setoff applies as detailed in Section 12, the purchase price for the Assets (the "Purchase Price") is $1,500,000 payable by Buyer by wire transfer in immediately available funds to an account designated by Seller as follows:

(a)     $1,000,000 on the Closing; and

(b)     $500,000 on January 12, 2012.

Article 5 - Representations and Warranties of Seller

References to federal, state and local laws or governmental authorities shall include the laws and governmental authorities of all jurisdictions (both within and outside of the United States) where Seller is carrying on business or where any of the Assets are located. Seller hereby represents and warrants to Buyer as follows:

5.1     Organization.

Seller is a corporation validly existing and in good standing under the laws of its jurisdiction of incorporation with the corporate power and authority to conduct the Business and to own the Assets.

5.2     Power and Authority.

Seller has the power and authority to execute, deliver, and perform this Agreement and the other agreements and instruments to be executed and delivered by it in connection with the transactions contemplated hereby and thereby, has taken all necessary corporate action to authorize the execution and delivery of this Agreement and such other agreements and instruments and the consummation of the transactions contemplated hereby and thereby. This Agreement is, and the other agreements and instruments to be executed and delivered by Seller in connection with the transactions contemplated hereby shall be, the legal, valid, and binding obligations of Seller, enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws now or hereafter in effect relating to creditors' and landlords' rights and general principles of equity.

5.3     No Conflict.

Neither the execution and delivery of this Agreement and the other agreements and instruments to be executed and delivered in connection with the transactions contemplated hereby or thereby, nor the consummation of the transactions contemplated hereby or thereby, will violate or conflict with:

(a)     any federal, state, or local law, regulation, ordinance, zoning requirement, governmental restriction, order, judgment, or decree applicable to Seller or the Business, or the Assets;

(b)     any provision of the articles of incorporation and bylaws or other organizational documents of Seller; or

(c)     except insofar as Required Contract Consents are to be procured prior to Closing, any mortgage, indenture, license, instrument, trust, contract, agreement, or other commitment or arrangement to which Seller is a party or by which Seller or any of the Assets is bound.

5.4     Government Consents.

No approval, certification, variance, license, or permit to or from, or notice, filing, or recording to or with (a "filing"), any federal, state, or local governmental authorities is necessary for the execution and delivery of this Agreement by the Seller and the other agreements and instruments to be executed and delivered by the Seller in connection with the consummation of the transactions contemplated hereby or thereby, or the ownership and use of the Assets.

5.5     Required Contract Consents.

Except for the Required Contract Consents, no approval, consent, or waiver from, or notice, filing, or recording to or with, any Person is necessary for the execution and delivery of this Agreement and the other agreements and instruments to be executed and delivered in connection with the transactions contemplated hereby or thereby or the consummation of the transactions contemplated hereby or the transfer of the ownership of the Assets to Buyer).

5.6     Customer Contract

(a)     The Customer Contract is legal, valid, binding, and, to the knowledge of Seller, in full force and effect as to the Seller; and the Seller is not in breach or default, and no event has occurred which with notice or lapse of time, or both, would constitute a breach or default, or permit termination or modification under the Customer Contract.   Seller has delivered to Buyer accurate and complete copies of the Customer Contract, together with all amendments thereto.

(b)     The services and TollPro Software provided by Seller under the Customer Contract satisfies in all material respects the terms, conditions and technical specifications of the Customer Contract.

(c)     Except as set forth on Schedule 5.6(c):

    (i)  All customer purchase and work orders for 2008 have been completed by the Seller; and

    (ii) All open customer purchase and work orders for 2009 are payable on a time and materials basis;

(d)     As of the date of this Agreement, Seller does not have any outstanding 2008 (or prior) customer purchase orders for work that has not been completed by Seller.

5.7     Title to Assets.

At Closing, Buyer shall obtain all of Seller's right, title and interest in and to all of the Assets free and clear of any security interests, mortgages, leases, chattel mortgages, conditional sales contracts, collateral security arrangements, or other title or interest retention arrangements.

5.8     Condition of Property.

All of the Computer Equipment is in reasonable operating order and condition.

5.9     Software.

(a)     Intellectual Property Owned by Seller.

    (1)     Exhibit "C" contains a description of the TollPro Software and Schedule 5.9(a)(1) contains a list of the registered Intellectual Property Rights related to the Software owned by Seller.

    (2)     Seller has good and marketable title to the TollPro Software and jointly owns the Jointly Owned Software free and clear of any and all encumbrances.   Seller owns or otherwise has all Intellectual Property Rights necessary for the marketing, commercialization, development and licensing of the Software to third parties.

    (3)     There are no orders or pending proceedings made by or against Seller with respect to the rights of Seller in the Software and, to the knowledge of Seller, there are no actions or

proceedings threatened in writing against Seller with respect to the rights of Seller in the Software, except as set forth on Schedule 5.9(a)(3).

(4)    The Software does not infringe any copyright of any other Person or make unlawful use of any copyright, trademark or proprietary information of others.

(5)    To the knowledge of Seller, there has not been, nor is there currently threatened, any misappropriation or infringement by any third party involving any Intellectual Property Rights of Seller in the Software.

(6)    All Persons materially involved in the conception, making, and development of the Software, including, but not limited to, the individuals listed in Section 8(i), have entered into a proprietary information and invention assignment agreements.

(7)    Seller has never received any written claim, demand, or notice that alleges that the Software infringes any Intellectual Property Rights of any other Person or that seeks to restrict in any manner the use, transfer or licensing of any of the Software, except as set forth on Schedule 5.9(a)(7).

(8)    Seller has not granted any exclusive rights or licenses with respect to the TollPro Software; and

(9)    No contractual rights granted by Seller in favor of any party to any of the TollPro Software (including TollPro Software which is the subject of an escrow agreement or similar arrangements) will be immediately triggered by the transactions contemplated hereby.

(b)    <u>Intellectual Property Used by Seller.</u>

(1)    Schedule 5.9(b)(1) contains a complete and correct list of all written license agreements pursuant to which any software or other intellectual property of any third party used by Seller in the performance of the Customer Contract is licensed to Seller, except for off-the-shelf and click-through software available to the general public and other software that is generally available on standard terms for less than $2,500 per copy, seat, CPU or named user ("Third-Party Intellectual Property").

(2)    All licenses or other material rights or permission to use any Third-Party Intellectual Property necessary for the performance of the Customer Contract have been obtained by Seller, and all license fees, royalties and any other amounts (if any) due and payable under such license agreements have been paid. With respect to each license required to be set forth on Schedule 5.9(b)(1): (i) such license is legal, valid, binding, and in full force and effect as to Seller; and (ii) Seller is not in breach or default, and, to the knowledge of Seller, no event has occurred which with notice or lapse of time, or both, would constitute a breach or default, or permit termination, modification, or acceleration under such license. Seller has delivered to Buyer accurate and complete copies of all such licenses, together with all amendments thereto.

(3)    The consummation of the transactions contemplated hereby will not, pursuant to the terms of any written agreement to which Seller is a party, result in the loss or impairment of any rights of Seller to use the Third-Party Intellectual Property.

(c)    <u>Other Seller Software.</u>

(1) The sale or transfer of the Other Seller Software pursuant to this Agreement is made on an as-is, where-is basis. Seller makes no representations to Buyer, whatsoever, with

respect to the Other Seller Software; and Seller shall have no liability to Buyer, whatsoever, with respect to the Other Seller Software, including, without limitation, any liability for breach of representations and warranties contained in this Section 5.9 or in Section 5.7 with respect to the Other Seller Software.

5.10    Litigation.

Except as set forth on Schedule 5.10, no claim, action, suit, proceeding, inquiry, hearing, arbitration, administrative proceeding, or investigation (collectively, "Litigation") is pending, or, to the knowledge of Seller, threatened against Seller, or any party to any Customer Contract, which could have a material adverse effect on any of the Assets.

5.11    Court Orders, Decrees, and Laws.

Except as set forth on Schedule 5.11, there is no outstanding or, to the knowledge of Seller, threatened order, writ, injunction, or decree of any court, governmental agency, or arbitration tribunal against Seller which could have a material adverse effect on any of the Assets. Seller is not in violation of any applicable federal, state, or local law, regulation, order, judgment, or decree, affecting, involving, or relating to the Assets.

5.12    Personnel and Compensation.

Seller has delivered to Buyer a true and complete list of the names and current compensation levels of (1) all salaried or annual employees and (2) all consultants involved in performance of the Customer Contract as of the date of this Agreement.

5.13    Broker's or Finder's Fees.

Seller has not authorized any person to act as broker or finder or in any other similar capacity in connection with the transactions contemplated by this Agreement in any manner that may or will impose liability on Buyer, except as set forth on Schedule 5.13.

5.14    Previous Deliveries.

Seller has provided to Buyer true and complete copies of the Assigned Contracts.

5.15    Leased Real Property.

(a).    A true, correct and complete copy of the Denver Office Lease, together with any amendments thereto or modifications thereof, is attached hereto as Schedule 5.15. There are no oral agreements or understandings between Landlord and Seller (or their respective predecessors-in-interest if applicable) with respect to the Denver Office Lease or any obligations of any party thereunder and neither party has waived any of its rights under the Denver Office Lease.

(b)    There are no renewal or extension options under the Denver Office Lease. 9. Seller is in sole possession of the Premises (as defined in the Denver Office Lease) and has not assigned, sublet, pledged, mortgaged, transferred or otherwise conveyed all or any portion of its interest in the Premises or the Denver Office Lease.

(c)    Base Rent and any Additional Rent (as defined in the Denver Office Lease) have been paid through the date of January 31, 2009. The amount of security deposit under the Denver Office Lease held by Landlord is $5,200, and Landlord holds no other funds of Seller.

(d)     To the knowledge of Seller, Landlord is not in default under the Denver Office Lease. To the knowledge of Seller, Seller is not in default under the Denver Office Lease, and to the knowledge of Seller, no event has occurred which, with the passage of time or the giving of notice, or both, would result in a default on the part of Seller under the terms of the Denver Office Lease. Seller has not, and to Seller's knowledge, Landlord has not, commenced any action or given or received any notice for the purpose of terminating the Denver Office Lease.

(e)     To the knowledge of the Seller, the tenant finishes described in Exhibit E to the Denver Office Lease were completed by Landlord in accordance with the terms of the Denver Office Lease and, to the knowledge of the Seller, all costs of such tenant finishes have been paid in accordance with the terms of Denver Office Lease.

(f)     Seller has not received notice from Landlord that the Landlord has designated a lock box collection agent as described in Section 5.d. of the Denver Office Lease.

5.16     Truth at Closing.

All of the representations, warranties, and agreements contained in this Article shall be true and correct and in full force and effect on and as of the Closing Date.


Article 6  - Representations and Warranties of Buyer

Buyer hereby represents and warrants to Seller as follows:

6.1     Organization.

Buyer is a corporation validly existing and in good standing under the laws of the State of Maryland with the corporate power and authority to conduct its business and to own and lease its properties and assets.

6.2     Power and Authority.

Buyer has the power and authority to execute, deliver, and perform this Agreement and the other agreements and instruments to be executed and delivered by it in connection with the transactions contemplated hereby and thereby, and Buyer has taken all necessary action to authorize the execution and delivery of this Agreement and such other agreements and instruments and the consummation of the transactions contemplated hereby and thereby. This Agreement is, and, when such other agreements and instruments are executed and delivered, the other agreements and instruments to be executed and delivered by Buyer in connection with the transactions contemplated hereby and thereby shall be, the legal, valid, and binding obligation of Buyer, enforceable in accordance with their terms.

6.3     Broker's or Finder's Fees.

Buyer has not authorized any person to act as broker, finder, or in any other similar capacity in connection with the transactions contemplated by this Agreement.

6.4     No Conflict.

Neither the execution and delivery by Buyer of this Agreement and of the other agreements and instruments to be executed and delivered by Buyer in connection with the transactions contemplated hereby or thereby, nor the consummation by Buyer of the transactions contemplated hereby or thereby will violate or conflict with (1) any federal, state, or local law, regulation, ordinance, governmental

restriction, order, judgment, or decree applicable to Buyer, or (2) any provision of any charter, bylaw, or other governing or organizational instrument of Buyer.

6.5    Government Consents.

No approval, certification, variance, license, or permit to or from, or notice, filing, or recording to or with (a "filing"), any federal, state, local, or foreign governmental authorities is necessary for the execution and delivery of this Agreement by the Buyer and the other agreements and instruments to be executed and delivered by the Buyer in connection with the consummation of the transactions contemplated hereby or thereby.

## Article 7 - Conditions to Seller's Obligations

Each of the obligations of Seller to be performed hereunder shall be subject to the satisfaction (or waiver by Seller) at or prior to the Closing Date of each of the following conditions:

7.1    Representations and Warranties True at Closing Date.

Buyer's representations and warranties contained in this Agreement shall be true on and as of the Closing Date with the same force and effect as though made on and as of such date; Buyer shall have complied with the covenants and agreements set forth herein to be performed by it on or before the Closing Date; and Buyer shall have delivered to Seller a certificate dated the Closing Date and signed by a duly authorized officer of Buyer to all such effects.

7.2    Litigation.

No Litigation shall be threatened or pending against Buyer before any court or governmental agency that, in the reasonable opinion of counsel for Seller, could result in the restraint or prohibition of any such party, or the obtaining of damages or other relief from such party, in connection with the consummation of the transactions contemplated by this Agreement.

## Article 8 - Conditions to Buyer's Obligations

Each of the obligations of Buyer to be performed hereunder shall be subject to the satisfaction (or the waiver by Buyer) at or prior to the Closing Date of each of the following conditions:

(a)    The representations and warranties of Seller contained in this Agreement shall be true on and as of the Closing Date with the same force and effect as though made on and as of such date and Seller shall have delivered to Buyer a certificate dated the Closing Date and signed by a duly authorized officer thereof to all such effects.

(b)    Seller shall have performed and complied with all agreements, obligations, and conditions required by this Agreement to be performed or complied with by them on or prior to the Closing.

(c)    All Required Contract Consents shall have been obtained.

(d)    No Litigation shall be threatened or pending against Buyer or Seller before any court or governmental agency that, in the reasonable opinion of Buyer, could result in the restraint or prohibition of the consummation of the transactions contemplated hereby.

(e)    There shall have been no material adverse change (whether or not such change is referred to or described in any supplement to the Schedules) with respect to the Assets since the date of execution of this Agreement.

(f)    Buyer shall not have received notice that Seller is in default under any Customer Contract;

(g)    Ashok Sinha shall have entered into an employment agreement with Buyer prior to the Closing (conditional upon the Closing being completed), in the form set forth as Exhibit "D" (the "Employment Agreement");

(h)    Buyer shall have received an executed consulting agreement from StewIT, Inc. and Fox Data Systems, Inc., in a form reasonably satisfactory to Buyer.

(i)    Buyer shall have received a Certificate, substantially in the form set forth as Exhibit "E" (the "Waiver Agreement"), duly executed by the Key Consultants.

(j)    Buyer shall have received an executed offer of employment from Seller accepted by Jaspal Singh Johar, in a form reasonably satisfactory to Buyer.


### Article 9 - Pre-Closing Covenants of Seller and Buyer


9.1    Conduct Pending Closing.

From the date of this Agreement through the Closing, Seller shall (a) continue to provide the services under the Customer Contract in the ordinary course, without substantial change; (b) take steps as are necessary, appropriate and commercially reasonable to preserve the Seller's existing relationship with the counter-party to the Customer Contract, and the suppliers and consultants being used by Seller in connection with providing the services under the Customer Contract; and (c) inform Buyer of the occurrence of any event which may result in a material adverse change to the Assets.

9.2    Consents.

Promptly following the execution of this Agreement, Buyer and Seller shall cooperate with one another and proceed, as promptly as is reasonably practicable, to seek and to obtain all of the Required Contract Consents.

9.3    Bulk Sales Laws.

Although Seller represents that it is not aware of any bulk sales laws that govern the transaction contemplated by this Agreement, Buyer and Seller shall cooperate with each other to ensure compliance with all bulk sales laws and other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Seller shall indemnify Buyer from, and hold Buyer harmless against, any liabilities, damages, costs and expenses resulting from or arising out of (a) the parties' failure to comply with any such laws in respect of the transactions contemplated by this Agreement and (b) any action brought or levy made as a result thereof.

9.4     Exclusive Dealing.

From the date of this Agreement through the Closing, Seller: (i) will deal exclusively with Buyer in connection with the issue or sale of any shares of Seller or all or substantially all of the assets of Seller (other than a sale of assets in the ordinary course of business) or any merger or consolidation involving Seller, (ii) will not solicit, or engage others to solicit, offers for the purchase or acquisition of any equity or all or substantially all of the assets of Seller (other than a sale of assets in the ordinary course of business) or for any merger or consolidation involving Seller, (iii) will not negotiate with or enter into any agreements or understandings with respect to any such transaction described in (i) or (ii) of this paragraph, and (iv) will inform Buyer if Seller has made any such solicitation or negotiation, or receives such an offer.

Seller acknowledges and agrees, for itself and each of the persons and entities referred to above, that any remedy at law for breach of the foregoing covenant will be inadequate, and in addition to any other relief which may be available, Buyer will be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages and without regard to the adequacy of any remedy at law. Notwithstanding, the foregoing, Seller's obligation of exclusive dealing shall not be binding if a material change or event (exclusive of a competing offer) shall have occurred that would make proceeding with the Closing illegal, invalid or contrary to the fiduciary duties of the board of directors of Seller.

9.5     Access.

From the date of this Agreement through the Closing, Seller will afford Buyer's designated employees, auditors, legal counsel and other authorized representatives all reasonable opportunity and access to inspect, investigate and audit the Assets, and in particular, the Assigned Contracts.  Buyer agrees to conduct such inspection, investigation and audit in a non-disruptive manner and at such times and places reasonably determined by Seller.

9.6     Notification.

During the period between the date of this Agreement and the earlier of the termination of this Agreement and the Closing Date (the "Pre-Closing Period"), Seller shall promptly notify Buyer in writing of:

(a)     the discovery by Seller of any event, condition, fact or circumstance that occurred or existed on or prior to the date of this Agreement and that caused or constitutes an inaccuracy in or breach of any representation or warranty made by Seller in this Agreement;

(b)     any event, condition, fact or circumstance that occurs, arises or exists after the date of this Agreement and that would cause or constitute an inaccuracy in or breach of any representation or warranty made by Seller in this Agreement if (A) such representation or warranty had been made as of the time of the occurrence, existence or discovery of such event, condition, fact or circumstance, or (B) such event, condition, fact or circumstance had occurred, arisen or existed on or prior to the date of this Agreement;

(c)     any breach of any covenant or obligation of Seller contained in this Agreement;

(d)     any event, condition, fact or circumstance that would make the timely satisfaction of any of the conditions set forth in Article 7 or 8 impossible or unlikely.

9.7     [Reserved]

9.8    Hiring of Contractors.

Seller shall use its reasonable efforts to enable Buyer to hire, on such terms as Buyer may reasonably establish, such of its employees and contractors currently dedicated to the Customer Contract as Buyer may specify on or before Closing. Seller shall pay any accrued but unpaid or untaken vacation/holiday time or sick days which may be owing to any such employees.

## Article 10 - Closing

10.1    Closing.

The Closing shall take place at the offices of Larkin Hoffman, 1500 Wells Fargo Plaza, 7900 Xerxes Avenue South, Bloomington, Minnesota 55431, at 10:00 a.m., on the Closing Date, and shall be effective as of the Closing Date.

10.2    Actions at Closing.

At Closing, Buyer and Seller shall take the following actions, in addition to such other actions as may otherwise be required under this Agreement:

(a)    Seller shall deliver the following to Buyer:

    (1)    A bill of sale, in the form attached as Exhibit "F", for the Assets duly executed by Seller;

    (2)    An assignment of the Customer Contract, in the form attached as Exhibit "G", duly executed by Seller;

    (3)    An Assignment and Assumption Agreement, in the form attached as Exhibit "H", related to the Denver Office Lease, duly executed by Seller;

    (4)    An intellectual property assignment, in the form attached as Exhibit "I", duly executed by Seller;

    (5)    The Required Contract Consents;

    (6)    Certificate of good standing for Seller;

    (7)    An Agreement, duly executed by Seller terminating all agreements made between Seller and Buyer or Telvent Caseta, Inc., under which the parties agreed to cooperate to bid on projects, including customer service centers or back office systems with Seller acting as a subcontractor to Buyer; and

    (8)    Buyer shall have received an executed offer of employment from Seller accepted by Jaspal Singh Johar, in a form reasonably satisfactory to Buyer.

(b)    Buyer shall pay that portion of the Purchase Price that is due on the Closing Date in full by wire transfer of immediately available funds.

(c)    Buyer shall deliver to Seller the Employment Agreement and the Consulting Services Agreement, in the form attached as Exhibit "J", duly executed by Buyer (the "Consulting Agreement").

10.3    Further Assurances.

In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the parties will take such further action (including execution and delivery of such further instruments and documents) as the other party reasonably may request, at the sole cost and expense of the requesting party.

10.4    Allocation of Purchase Price.

The Purchase Price shall be allocated among the Assets as specified on Exhibit "K". Buyer and Seller agree to report this transaction for state and federal tax purposes in accordance with the allocation as therein set forth. Any setoff or adjustment by Seller in the payment of the Purchase Price shall constitute an adjustment to the Purchase Price for purposes of the Allocation.

<div align="center">Article 11 - Covenants of Seller and Buyer Following Closing</div>

11.1 Transfer Taxes.

All sales, transfer, and similar taxes and fees (including all recording fees, if any) incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by Seller and Seller shall file all necessary documentation with respect to such taxes.

11.2 Non-Compete.

(a)    For the period beginning on the Closing Date and continuing until the fourth anniversary of the Effective Date, Seller shall not:

   (1)    cause, induce or encourage any actual or prospective user of the Software, or any other Person who has a business relationship with Buyer, to terminate or change any such actual or prospective relationship in a manner which would be adverse to Buyer;

   (2)    subject to the rights and obligations of Seller under section 11.3 below, conduct, participate or engage, directly or indirectly (whether as a principal, sole proprietor, partner, stockholder, agent, consultant, subcontractor, joint venturer, team member or in any other capacity), acquire, own or have any interest (other than a three percent (3%) or less ownership in an entity whose securities are traded on a recognized securities exchange or quotation system), in any business, or support any product or any business, that is competitive with the Business (as conducted on the Effective Date or at any time during the two years immediately prior to the Effective Date);

   (3)    subject to the rights and obligations of Seller under section 11.3 below, take any action or cause any third party (including affiliates of Seller) to take any action to create any Intellectual Property Rights relating to the Software that may be reasonably expected to compete with the Intellectual Property Rights sold to Buyer hereunder.

   (4)    sell Seller's joint ownership interest in, or grant a license to use the E-470 Works to any Person.

(b)    The covenant in the foregoing sentence shall encompass the activities of Seller and its affiliates in all areas of the world. Seller acknowledges that the Business is a worldwide business and agrees that this covenant is reasonable with respect to its duration, geographical area and scope. The obligations of Seller set forth in paragraph (a), above shall not include activities of Seller or its affiliates undertaken in connection with the Consulting Agreement.

(c)     The covenants and undertakings contained in this Article relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this Article will cause irreparable injury to Buyer, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Therefore, Buyer will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of a breach of this Article. The rights and remedies provided by this Article are cumulative and in addition to any other rights and remedies which Buyer may have hereunder or at law or in equity. If Buyer were to seek damages for any breach of this Article, the portion of the Purchase Price delivered to Seller hereunder which is attributed by the parties to the foregoing covenant shall not be considered a measure of or limit on such damages.

(d)     The parties agree that, if any court of competent jurisdiction in a final non-appealable judgment determines that a specified time period, a specified geographical area, specified business limitation or any other relevant feature of this Article is unreasonable, arbitrary or against public policy, then a lesser time period, geographical area, business limitation or other relevant feature which is determined to be reasonable, not arbitrary and not against public policy may be enforced against the applicable party.

11.3  Temporary License with respect to E-470

Seller shall have a temporary license to use and have access to the TollPro Software and any of the other Assets transferred to Buyer hereunder solely for the purpose of, and to the extent necessary, to enable Seller fulfill its obligations under the work orders issued by E-470 and accepted by Seller under the Agreement for Consulting Services (On Call Services) dated March 9, 2007(the "E-470 Services Agreement") provided however:

(a)     Seller shall bear the costs of fulfilling work orders under the E-470 Services Agreement with E-470 and shall be entitled to the revenue from those work orders;

(b)     Seller shall not enter into any new agreements, work orders or purchase orders with E-470 other than work orders that Seller is obligated to perform under the E-470 Services Agreement;

(c)     Seller shall give notice of non-renewal of the E-470 Services Agreement in accordance with section 2 of the said agreement;

(d)     Seller shall require E-470 to issue written requests for Work Order Submittals in accordance with Section 6 of the E-470 Services Agreement and in Seller's Work Order Submittals shall not propose to use Ashok Sinha for any of the work and shall limit the use of any of the Key Consultants as the proposed personnel for the work to a number of hours and to a schedule for the completion of the work that will not unreasonably interfere or conflict with work planned for the Key Consultants by Telvent; and

(e)     If Seller receives a notice from E-470 pursuant to section 1(c) of the Software License Agreement dated February 18, 2004 between Seller and E-470, Seller shall notify E-470 that Seller intends to submit a bid to the same entity and Seller and Buyer shall cooperate to submit a bid by Seller on the basis that the products and services to be supplied pursuant to any contract made in response to the bid will be supplied by Buyer as a subcontractor to Seller for that project.

11.4 Right of First Refusal for Seller's Interest in the E-470 Works

If after the end of the four year period referred to in section 11.2, or at any time if the non-competition covenant in section 11.2 is held by a court of competent jurisdiction to be unenforceable, Seller proposes

to sell or accept a bona fide offer (a "Purchase Offer") from any Person to purchase Seller's interest in the E-470 Agreements or Seller's joint ownership interest in the E-470 Works or purchase a license to use the E-470 Works (the "E-470 Rights"), Buyer shall have a right of first refusal to purchase such E-470 Rights on the following terms:

(a)     the Seller shall promptly deliver a notice (the "Notice") to Buyer stating the proposed price and other material terms of the proposed sale including, without limitation, a description of the E-470 Rights to be sold or transferred, the nature of such sale or transfer, the proposed price, and the name and address of the prospective purchaser. The Notice shall certify that the Seller has received a firm offer from the prospective purchaser and in good faith believes a binding agreement for the sale is obtainable on the terms set forth in the Notice.

(b)     Buyer shall then have the right, exercisable by notice within thirty (30) days after receipt of the Notice (the "Notice Period"), to exercise such Right of First Refusal.

(c)     If Buyer does not exercise its rights to buy the E-470 Rights referred to in the Notice within the Notice Period, the Seller may sell the said E-470 Rights to a third party at a price and on terms no more favorable to the third party than those specified in the Notice, provided that such sale is completed within sixty (60) days of the date of delivery of the Notice.

(d)     In the event the Seller does not complete the sale of the E-470 Rights within the sixty (60) day period from the expiration of the Notice Period, Buyer's rights of first refusal shall continue to be applicable to any subsequent proposed sale of any E-470 Rights.

(e)     The exercise or non-exercise by Buyer of Buyer's rights of first refusal hereunder with respect to one or more sales or proposed sales of E-470 Rights by Seller shall not adversely affect Buyer's rights of first refusal with respect to any subsequent proposed sales of any E-470 Rights by Seller.

(f)     Seller shall not sell any E-470 Rights except in compliance with this section.

11.5 Licenses for the E-470 Works

On request from Buyer, Seller shall sell licenses to Buyer to use and sub-license the E-470 Works at the following prices:

| Description | Price |
| --- | --- |
| Customer Service Center | $20,000 |
| Violations Processing Center | $20,000 |
| Host | $20,000 |
| Plaza Functions | $20,000 |
| Maintenance On-line Management System (MOMS) | $7,500 |
| Toll Audit | $7,500 |

Article 12 - Indemnity

12.1    Indemnification by Seller.

Seller shall indemnify, defend, and hold harmless Buyer and its respective successors and assigns and the directors, officers, employees, managing partners and agents of each, from and against any and all demands, claims, actions, or causes of action, assessments, losses, damages, liabilities, costs, and expenses, including reasonable fees and expenses of counsel, other expenses of investigation, handling,

and litigation, and settlement amounts (collectively, a "Loss" or "Losses"), asserted against, resulting to, imposed upon, or incurred by Buyer, directly or indirectly, by reason of, resulting from, or arising in connection with any of the following:

(a)     Any breach of any representation, warranty, or agreement of Seller contained in or made pursuant to this Agreement, including the agreements and other instruments contemplated hereby.

(b)     The failure of Seller to pay or discharge any obligation or liability of Seller not specifically assumed by Buyer under Article 3 of this Agreement ("Excluded Liabilities") when the same shall become due and payable.

(c)     Any failure to comply with any "bulk sales" or similar laws relating to notices to creditors.

In the event that Buyer has notified Seller of a good faith claim by Buyer for indemnity pursuant to the provisions of this Article 12 and Seller is unable to perform any of its indemnification obligations hereunder, Buyer shall have a right to setoff and retain out of any payments owed to Seller under this Agreement, as detailed in Article 4, an amount equal to Buyer's reasonable estimate of the amount of such claim (up to an amount equal to the limit of Seller's liability hereunder) until Buyer's claim for indemnity has been settled by agreement between the parties or determined by an order of a court of competent jurisdiction or arbitrator.

12.2     Indemnification by Buyer.

Buyer shall indemnify, defend, and hold harmless Seller and its successors and assigns and the directors, officers, employees, and agents of Seller, from and against any and all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs, and expenses, including reasonable fees and expenses of counsel, other expenses of investigation, handling, and litigation, and settlement amounts (collectively, a "Loss" or "Losses"), asserted against, resulting to, imposed upon, or incurred by Seller, to the extent arising from any of the following:

(a)     Any breach of any representation, warranty, or agreement of Buyer contained in or made pursuant to this Agreement, including the agreements and other instruments contemplated hereby.

(b)     Any failure of Buyer to perform the obligations assumed by Buyer under Article 3.1, except insofar as such Loss represents an Excluded Liability.

12.3     Notice of Claim.

The party entitled to indemnification hereunder (the "Claimant") shall promptly deliver to the party liable for such indemnification hereunder (the "Indemnifying Party") notice in writing (the "Required Notice") of any claim for indemnity under this Article 12, specifying in reasonable detail the nature of the Loss, and, if known, the amount, or an estimate of the amount, of the liability arising therefrom (the "Claim"). The Claimant shall provide to the Indemnifying Party as promptly as practicable thereafter information and documentation reasonably requested by the Indemnifying Party to support and verify the claim asserted, provided that, in so doing, it may restrict or condition any disclosure in the interest of preserving privileges of importance in any foreseeable litigation.

12.4     Defense.

In connection with any claim giving rise to indemnity hereunder arising out of any claim or legal proceeding by any person who is not a Claimant, the Indemnifying Party at its sole cost and expense may, upon written notice to the Claimant, elect to assume the defense of any such claim or legal proceeding. If

Page 19

the Indemnifying Party has so elected to assume the defense of any such claim or legal proceeding, such defense shall be conducted by counsel chosen by the Indemnifying Party, provided that such counsel is reasonably satisfactory to the Claimant. The Claimant shall be entitled to participate in (but not control) the defense of any such action with its own counsel and at its own expense. If the Indemnifying Party has elected to assume the defense of any claim or legal proceeding as provided herein, the Claimant shall not be entitled to indemnification for legal fees and expenses relating to such claim or proceeding that are incurred by the Claimant after the time at which the Indemnifying Party has so elected. The Claimant shall not settle or compromise any indemnified liability without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld. In the event that the Indemnifying Party shall so assume such defense, it shall not compromise or settle any such claim, action, or suit unless (i) the Claimant gives its prior written consent, which shall not be unreasonably withheld, or (ii) the terms of the compromise or settlement of such claim, action, or suit provide that the Claimant shall have no responsibility for the discharge of any settlement amount and impose or create no other obligations, liabilities or duties on the Claimant, and the compromise or settlement discharges all rights against the Claimant with respect to such claim, action, or suit. The Claimant will reasonably cooperate with the defense of any such claim, action, or suit and will provide such personnel, technical support, and access to information as may be reasonably requested by the Indemnifying Party in connection with such defense.

12.5    Time of Assertion.

(a)    No indemnification shall be payable by Buyer with respect to matters as to which Buyer has not received notice from Seller within eighteen (18) months after the Closing Date, except as set forth in Section 12.5(b) and except that such time limitation shall not apply to any Claim arising out of a failure by Buyer to perform the obligations assumed by Buyer under Article 3.1, except insofar as such Loss represents an Excluded Liability.

(b)    No indemnification shall be payable by Seller to Buyer with respect to matters as to which Seller has not received notice from Buyer within eighteen (18) months after the Closing Date, except that such time limitation shall not apply to:

 (1) any Claim arising out of a failure of Seller to pay or discharge any Excluded Liabilities;

 (2) any Claim for indemnification for Losses arising from a breach of the following representations and warranties, that shall survive until expiration of the applicable statute of limitations for claims:

   o Section 5.2 (Power and Authority);

   o Section 5.7 (Title to Assets)

   o Section 5.9(a) (Title to Software and absence of Infringement Claims).

12.6    Limitation on Indemnity Obligations.

(a)    Notwithstanding any other provision contained in this Agreement, the obligations of Seller to indemnify Buyer with respect to claims by Buyer for indemnity pursuant to Article 12 of this Agreement shall be limited to a maximum of $1,000,000 USD, in the aggregate. This limitation shall not apply to any Claim by Buyer for indemnification for Losses arising from a breach of the following representations and warranties:

 o Section 5.2 (Power and Authority);

 o Section 5.7 (Title to Assets)

       o   Section 5.9(a) (Title to Software and absence of Infringement Claims).

(b)    Neither party hereto will be liable to the other hereunder for any punitive, consequential or incidental damages (including loss of revenue or income, business interruption, cost of capital or loss of business reputation or opportunity) relating to any claim for which either such party may be entitled to recover under this Agreement (other than indemnification of amounts paid or payable to third parties in respect of any third party claim for which indemnification hereunder is required.

(c)    The indemnification provisions of Article 12 will constitute the sole and exclusive remedy of the parties for monetary damages with respect to any breach of any of the representations, warranties, or covenants contained in this Agreement or any of the ancillary agreements or with respect to any Losses resulting from, arising out of, or caused by Excluded Liabilities.

## Article 13 - Termination Prior to Closing

13.1    Termination of Agreement.

This Agreement may be terminated at any time prior to the Closing as follows:

(a)    <u>Mutual Consent.</u> By the mutual consent of Buyer and Seller;

(b)    <u>Deadline.</u> By either party without liability, by giving notice in writing to the other party, if the Closing shall not have occurred on or before the 6th day of February, 2009 (provided the terminating party is not in material breach of its representations, warranties, covenants or agreements under this Agreement); or

(c)    <u>Material Breach.</u> A party may terminate this agreement by giving notice in writing to the other party, if the other party materially breaches any of its representations, warranties, agreements, or covenants contained herein, and fails to remedy such failure or breach within ten (10) business days after receiving notice in writing of such breach.

13.2    Termination of Obligations.

Termination of this Agreement pursuant to this Article 13 shall terminate all obligations of the parties hereunder, except for the obligations set forth in the Confidentiality Agreement, dated March 17, 2008, by and among Telvent Traffic North America Inc., Seller and Ashok Sinha, and, except in connection with termination pursuant to Article 13.1(c), there shall be no liability on the part of Buyer or Seller or their respective officers or directors.

## Article 14 - Miscellaneous

14.1    Entire Agreement.

This Agreement (including the Schedules), the Confidentiality Agreement dated March 17, 2008, by and among Telvent Traffic North America Inc., Seller and Ashok Sinha, and the other certificates,

agreements, and other instruments to be executed and delivered by the parties in connection with the transactions contemplated hereby, constitute the sole understanding of the parties with respect to the subject matter hereof. No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the parties hereto.

14.2   Parties Bound by Agreement; Successors and Assigns.

The terms, conditions, and obligations of this Agreement shall inure to the benefit of and be binding upon the parties hereto and the respective successors and assigns thereof. Buyer shall have the right to assign this Agreement, in whole or in part, to any affiliates of Buyer or to designate any of its affiliates (to the extent permitted by law) to receive directly the Assets or to exercise any of the rights of Buyer, or to perform any of its obligations. Except as provided in the preceding sentence, Seller and Buyer shall not voluntarily assign this Agreement, in whole or in part, whether by operation of law or otherwise, without the prior written consent of the other parties hereto, and any such assignment contrary to the terms hereof shall be null and void and of no force and effect. In no event shall the assignment by Seller or Buyer of its respective rights or obligations hereunder, whether before or after the Closing, release Seller or Buyer from its respective liabilities and obligations hereunder.

14.3   Waiver.

No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provision hereof (whether or not similar).

14.4   Expenses.

Seller and Buyer shall each pay all costs and expenses incurred by it or on its behalf in connection with this Agreement and the transactions contemplated hereby, including fees and expenses of its own financial consultants, accountants, and counsel.

14.5   Notices.

Any notice, request, instruction, or other document to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered as follows:

a.    If to Seller to:
      Northern Lakes Development Corp.
      18280 Overland Trail
      Eden Prairie, MN 55347-4191

      Attention:  President

      With a copy to:
      Larkin Hoffman
      1500 Wells Fargo Plaza
      7900 Xerxes Avenue South
      Bloomington, Minnesota 55431
      Fax: (952) 896-3333
      Attention:  William G. Thornton, Esq.

or to such other person or address as Seller shall furnish to Buyer in writing pursuant to the above.

b.    If to Buyer to:
      Telvent Farradyne Inc.

Page 22

3206 Tower Oaks Blvd,
Rockville, Maryland, 20852
Fax:
Attention: Alfredo Escriba

With a copy to:

Telvent Farradyne Inc.
c/o Telvent Canada Ltd.
200, 10333 Southport Road S.W.,
Calgary, AB, Canada, T2W 3X6
Attention: Cameron Demcoe
Fax: +1 403 301-5027

Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver Colorad 80202
Attention: Matthew R. Perkins
Fax: (303) 893-1379

or to such other person or address as Buyer shall furnish to Seller in writing pursuant to the above. Any notice that is delivered personally in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party (or its agent for notices hereunder).

14.6    Governing Law..

This Agreement shall be construed in accordance with and governed by the laws of the State of Minnesota without giving effect to the principles of conflicts of law thereof.

14.7    Public Announcements.

Seller and Buyer shall consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby. Neither Seller nor Buyer shall issue any such press release or make any public statement without the agreement of the other party, except as such party's counsel advises in writing may be required by law. The parties shall agree on the text of a press release to be issued on the Closing.

14.8    Third-Party Beneficiaries.

There shall exist no right of any person to claim a beneficial interest in this Agreement or any rights occurring by virtue of this Agreement.

14.9    Survival of Agreements.

All covenants, agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement and the Closing and shall not be deemed waived or otherwise affected by any investigation made by any party hereto, provided however, that the representations, warranties and indemnities shall only survive as per Article 12 - Indemnification.

14.10   Access to Information.

(a)     Upon reasonable notice stating any reasonable purpose, including but not limited to obtaining information relevant to tax returns, third party claims, litigation involving the requesting party or as otherwise required for the conduct of Buyer's or Seller's business, each party shall, but only to the extent necessary to satisfy the requesting party's stated purpose, (i) give to the other and its authorized representatives reasonable access, during regular business hours, following the Closing, to any and all of the contracts, books, records and data relating to the Assets, and (ii) cause to be furnished promptly to the other party from time to time all information in its possession relating to the Assets as may be reasonably requested, provided, however, that the obligations of this paragraph are subject to the prior receipt by the disclosing party of the required consents of third parties (including employees with respect to personnel records), and further subject of the execution and delivery by the requesting party and its representatives of confidentiality agreements.

(b)     Buyer agrees that it will keep the Business Records for a period of five (5) years after the Closing, or for any longer period as may be required by any governmental agency or in accordance with paragraph (a) above. In the event Buyer wished to destroy the Business Records after that time, it shall first give ninety (90) days' prior written notice to Seller and Seller shall have the right at its option to take possession of the Records provided that it does so no later than sixty (60) days after the end of such ninety (90) day period.

*Signature page follows*

In Witness Whereof, each of the parties hereto has caused this Agreement to be executed on its behalf.

Northern Lakes Data Corp.

By: _____

Name: _____ ASHOK SINHA _____

Title: _____ PRESIDENT _____

Date: _____ 2/2/09 _____

Telvent Farradyne Inc.

By: _____

Name: _____ ~~CAMERON G. DEMCOE~~ _____

Title: _____ ~~Corporate Secretary~~ _____

Date: _____ Feb 2, 2009 _____

*Signature page to Asset Purchase Agreement*

Page 25