UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **Northern Lakes Data Corp.** | ) | |
| **and Ashok Sinha** | ) | **Case No.  0:11-cv-01755** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Judge John R. Tunheim** |
| **v.** | ) | |
| | ) | **Magistrate Judge Leo Brisbois** |
| **Telvent GIT, S.A.,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANT TELVENT USA CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT

---

## I.   INTRODUCTION

Defendant Telvent USA Corporation respectfully submits this memorandum of law in support of its motion to dismiss all 14 causes of action alleged against it in the complaint.[1]

## II.   STATEMENT OF FACTS

The complaint alleges that plaintiff Northern Lakes Data Corporation ("NLDC"), a corporation wholly-owned by plaintiff Ashok Sinha ("Sinha"), (Complaint ¶1), developed software called "TollPro" that supports backoffice operations of electronic tolling authorities. (Complaint ¶17).   All of the causes of action alleged in the complaint

---

[1] Telvent GIT, S.A. has not been served and is not a defendant herein as of the filing of this motion.  Without waiving any requirement that Telvent GIT, S.A. be properly served, we note that it is not a party to any of the agreements at issue in the complaint, nor does the complaint contain any allegations concerning Telvent GIT or any of its employees.

concern three interlocking agreements (collectively, "the Agreements") in which Telvent USA Corporation ("TUSA"), formally known as Telvent Farradyne, Inc., (1) purchased all rights to TollPro from NLDC; (2) retained the services of NLDC as a consultant; and, (3) employed Sinha. The Agreements were negotiated by sophisticated parties, fully represented by counsel at every stage, and are lengthy and complex documents, including numerous exhibits and schedules, and, by their terms, are complete statements of the parties' agreements. As the copies of these documents filed with the complaint are incomplete, we annex hereto full copies as follows: Exhibit 1 is the Asset Purchase Agreement between NLDC and TUSA (the "APA"); Exhibit 2 is the Consulting Services Agreement between NLDC and TUSA (the "CSA"); and Exhibit 3 is the Employment Agreement between Sinha and TUSA.

**A.    The APA**

On February 2, 2009, NLDC and TUSA entered into the APA, which provided for the sale by NLDC to TUSA of assets, including but not limited to, the TollPro Software, "all Intellectual Property Rights in and to the name and trademark 'TollPro'", and all goodwill related to TollPro. (Complaint ¶46) (Ex. 1 at §2.1). Pursuant to the APA, TUSA **has already paid $1 million** to NLDC, and will pay another $500,000 on January 12, 2012. (Complaint ¶¶46-47). Under the APA, TUSA did not purchase a software suite called "E-470 Works", nor did it acquire any rights to contracts between NLDC and the Colorado E-470 Public Highway Authority (the "E-470 Agreements") (Complaint ¶30) (Ex. 1 at §2.2).

The APA contains an integration clause:

This Agreement (including the Schedules), the Confidentiality Agreement dated March 17, 2008, by and among Telvent Traffic North America, Inc., Seller, and Ashok Sinha, and the other certificates, agreements, and other instruments to be executed and delivered by the parties in connection with the transactions contemplated hereby, **constitute the sole understanding of the parties** with respect to the subject matter hereof. No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the parties hereto.

(Ex. 1 at §14.1) (emphasis added). The CSA and the Employment Agreement are exhibits to the APA and were executed with it. (Complaint Ex. 1). Accordingly, the APA, CSA and Employment Agreement constitute the sole understanding of TUSA, NLDC and Sinha with respect to all aspects of the sale of TollPro, NLDC's consultancy and Sinha's employment by TUSA. (Ex. 1 at §14.1).

**B.   The CSA**

NLDC and TUSA executed the CSA on February 2, 2009. (Ex. 2). The CSA provides for NLDC to provide consulting services to TUSA through December 31, 2011. *Id.* Under the CSA, TUSA made fixed payments to NLDC of $2 million although NLDC has not been required to perform any work. (Complaint ¶42) (Ex. 2 at §4.1(a)). The CSA also provided for two conditional payments if by December 31, 2010 (1) TUSA was awarded a contract for a backoffice and customer support center using TollPro software as a result of a bid or proposal using the E-470 system as a reference; or (2) TUSA signed an agreement with the Colorado E-470 Public Highway Authority. (Complaint ¶43) (Ex. 2 at §4.1(a)); however, neither contingency was realized by the prescribed date. (Complaint ¶43). Accordingly, TUSA had no obligation to make the conditional payments. (*Id.*).

The CSA also provided that TUSA would make certain incentive payments to NLDC in connection with any contract made by TUSA or TUSA's then subsidiary Telvent Caseta, Inc. ("Caseta") with a tolling agency for backoffice and customer service center systems utilizing TollPro or other software developed by TUSA's Strategic Business System unit, headed by Sinha ("SBS Contracts").   (Complaint ¶44) (Ex. 2 at §4.1(b)).   The Complaint alleges that TUSA has not made any SBS Contracts to date; therefore no incentive payments have been paid to NLDC.  (Complaint ¶44).

## C.   Employment Agreement

As the final piece of the February 2, 2009 transactions, Sinha and TUSA executed an Employment Agreement, (Complaint ¶34) (Ex. 3), pursuant to which Sinha was appointed TUSA's Vice President - Strategic Business Systems with an annual starting base salary of $180,000.00.  (Ex. 3).

The Employment Agreement provides that Sinha would report to Larry Yermack, then President of TUSA's.  (Ex. 3 at 1).   The complaint alleges this provision was inserted because Sinha did not want to report to defendant Glenn Deitiker ("Deitiker"), President of Caseta.  (Complaint ¶32).  The Employment Agreement, however, contains no provision that Sinha will not report to Deitiker; to the contrary, the responsibilities listed in the Employment Agreement include performing duties for affiliates of [TUSA], "including without limitation, Telvent Caseta, Inc." (Ex. 3 at 1).

Sinha's responsibilities as Vice President - Strategic Business Systems are listed as follows:

1.   Sales of back-office and customer service center systems utilizing the TollPro Software or other software developed by the Strategic Business Systems division;

2.   Supporting projects which include the delivery of both electronic toll collection systems and the systems and software reference in sub-paragraph 1 above;

3.   Development of new technology related to back-office and customer service center systems, in accordance with research and development budgets approved by the Board of Directors of [TUSA]; and

4.   Such other duties compatible with your position, as [TUSA] may reasonably require, including performing duties for affiliates of [TUSA], including without limitation, Telvent Caseta, Inc."

(Ex. 3 at 1).

The Employment Agreement with its attachment regarding confidential information runs to 12 pages in length, but makes no mention of the "promises" that Sinha now alleges were made during negotiations. The Employment Agreement does not state that Sinha would have "4-5 employees working for him in the SBS unit," nor that he would have a "commensurate budget." (*Compare* Complaint ¶29 and Ex. 3). Sinha makes these allegations two years after signing the Agreements, which are obviously heavily-negotiated, carefully drafted documents that he acknowledged when he entered into them, were the parties' sole and complete understanding of their subject matter.

**D.   Defendants Deitiker and BancPass**

The complaint alleges that Deitiker, currently Senior Vice President of the Transportation Division of TUSA, (Complaint ¶26), became president of Caseta in 2007, and that his employment contract, not attached to the Complaint, "provided him with

complete control over tolling business operations at Telvent and its affiliated companies." (Complaint ¶24).

The complaint alleges that defendant BancPass, Inc. ("BancPass") is a Texas corporation in which Deitiker is an officer and major shareholder. (Complaint ¶¶9, 25). BancPass is not owned or operated by Telvent GIT, TUSA or any other Telvent-related company. (Complaint ¶25). The complaint alleges that BancPass's main product is backoffice tolling software that directly competes with TollPro. (Complaint ¶25).

### E. Plaintiffs' Allegations of Breach of the Agreements

In an effort to shift blame from Sinha's failure to achieve his sales goals and responsibilities, the complaint alleges that unspecified defendants "have acted to impair Ashok's efforts to sell backoffice business on behalf of Telvent and to build the SBS Division," (Complaint ¶55), by falsely telling Sinha that RFPs issued by potential customers had no backoffice component. (Complaint ¶¶56, 59). Plaintiffs claim that these alleged misrepresentations caused Sinha to lose opportunities to place bids. (Complaint ¶56).

The Complaint further alleges that unspecified defendants have asserted, at unspecified times, that unspecified backoffice opportunities were not "suitable" or "attractive" for TollPro, causing TUSA to decide not to bid on them, whereupon BancPass or other TollPro competitors placed bids instead. (Complaint ¶57). In addition, plaintiffs claim unspecified defendants have told unidentified potential customers on unspecified dates that TollPro – a product owned by TUSA – is

"vaporware," that the intellectual property is subject to legal challenge, and that it is not a good product. (Complaint ¶63).

Admitting Sinha's failure to secure new contracts, the complaint alleges that defendants have "made it virtually impossible for Ashok to secure contracts for the SBS unit," and, as a result, NLDC has not received any of the conditional or incentive payments set forth in the CSA. (Complaint ¶64).

### F.    Sinha's Post-Agreement Dispute

The Complaint alleges that, on April 21, 2010, Sinha's counsel wrote to Cameron Demcoe, Esq., TUSA's Director of Legal Services. (Complaint ¶70). Plaintiffs assert that the letter, which is not attached to the complaint, described breaches of Sinha's Employment Agreement and the frustration of NLDC's expectations for incentive payments under the CSA. (*Id.*). The Complaint alleges that Demcoe contacted Sinha and told him that Deitiker would be fired by January, 2011. (*Id.*).

## III.   LAW AND ARGUMENT

### A.    Standard of Review

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the non-moving party." *Shukh v. Seagate Tech.*, LLC, 2011 U.S. Dist. LEXIS 33924, 10-11 (D. Minn. 2011). To survive a motion to dismiss, however, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct.

1955, 167 L. Ed. 2d 929 (2007)).  Rather, a complaint must include "sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*

(internal quotation marks omitted). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*   Where a complaint pleads only

alleged conduct without "further factual enhancement[,] it stops short of the line between

possibility and plausibility," and therefore, must be dismissed. *Twombly,* 550 U.S. at 557.

> **B.** **Counts One, Two and Three Should Be Dismissed Because Plaintiffs'**
> **Fraudulent Misrepresentation Claims Fail To State A Cause of Action**
> **Against TUSA.**
>
> > 1. Counts One and Two Should Be Dismissed With Prejudice Because
> >    They Are Based on Future Promises.

To succeed on a claim for fraudulent misrepresentation, a plaintiff must prove:

> (1) there was a false representation by a party **of a past or**
> **existing material fact** susceptible of knowledge; (2) made
> with knowledge of the falsity of the representation or made as
> of the party's own knowledge without knowing whether it
> was true or false; (3) with the intention to induce another to
> act in reliance thereon; (4) that the representation caused the
> other party to act in reliance thereon; and (5) that the party
> suffer pecuniary damage as a result of the reliance.

*Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 532 (Minn. 1986) (emphasis added).

A representation or promise as to future acts or expectations does not provide the basis of

a claim for fraud misrepresentation.  *Davis v. Midwest Disc. Sec., Inc.,* 439 N.W.2d 383,

387 (Minn. App. 1989); *Dollar Travel Agency, Inc. v. Nw. Airlines, Inc.,* 354 N.W.2d 880,

883 (Minn. App. 1984) ("Fraud must relate to past or existing fact and cannot be

predicated on statements of intention or opinion."), *review denied,* (Minn. Dec. 21, 1984);

*Exeter Bancorporation, Inc. v. Kemper Secs. Group, Inc.*, 58 F.3d 1306, 1312 (8th Cir. 1995) (failure to carry out a promise, with nothing more, does not constitute fraud; "there must be affirmative evidence that, when the maker made the promise, he or she had no intention of keeping it"). Moreover, statements that "constitute mere predictions or opinion, … cannot form the basis of a fraud claim." *Lagermeier*, 2011 U.S. Dist. LEXIS 78525 at *17.

In Count One, plaintiffs allege that "Telvent" made a misrepresentation that "it intended to perform under the Agreements[.]" (Complaint ¶73).[2] This allegation concerns a promise of future conduct, and not a misrepresentation of a past or existing material fact, and, as such, cannot form the basis for a claim of fraudulent misrepresentation. *Dollar Travel Agency, Inc.*, 354 N.W.2d at 883; *General Mktg. Servs. v. Am. Motorsports, Inc.*, 393 F. Supp. 2d 901, 908 (D. Minn. 2005) (claims of fraudulent misrepresentation dismissed: alleged statements were forward-looking rather than statements of "past or existing material fact susceptible of knowledge"). Clearly, this allegation is really a claim for breach of contract masquerading as fraud. Failure to perform under an agreement is the epitome of breach of contract.

Count Two alleges that Sinha did not terminate his Employment Agreement for "good reason" because Demcoe said that Deitiker would be terminated in the future.

---

[2] The inclusion of Telvent GIT, S.A. as a defendant in the fraudulent misrepresentation claims adds further to the confusion and ambiguity of these counts, as the complaint does not allege any specific conduct, of any kind, by that company or any of its employees, and plaintiffs' Agreements were all with TUSA.

(Complaint ¶¶70, 79).[3]  Demcoe's alleged statement is not even a promise, but merely a prediction, and, as such, cannot provide the basis of a fraud claim.  *See Lagermeier*, 2011 U.S. Dist. LEXIS 78525 at *17.  There is, moreover,  no factual basis provided in the complaint for concluding that Demcoe, at the time he made the alleged statement, had no intention of keeping any promise that it contained.  Although the complaint asserts that "Telvent's false representations were made knowingly and intentionally, with intent to induce Plaintiffs not to terminate the Agreements," (Complaint ¶¶75, 81).  Such conclusory statements are not sufficient to meet Rule 9(b)'s pleading requirement.  *Wiley v. Mitchell*, 106 Fed. Appx. 517, 521-22 (8th Cir. 2004).

Because the Complaint does not set forth any allegations of "past or existing material fact susceptible of knowledge," but alleges instead future promises or predictions, Counts One and Two fail to plead the first element of a cause of action for fraudulent misrepresentation, and should be dismissed.

2.      Plaintiffs Fail to Plead Fraud with the Requisite Particularity.

In addition to the requirement that any cause of action be pleaded in sufficient factual detail to be plausible, a cause of action for fraudulent conduct must set forth "the circumstances constituting fraud or mistake" with "particularity." Fed. R. Civ. P. 9(b). "[C]ircumstances constituting fraud" include "such matters as the time, place and contents of false representations, as well as the identity of the person making the

---

[3] The complaint asserts that the two plaintiffs did not terminate the Agreements despite having "good reason" therefor; however, the "good reason" provision that allows Sinha to terminate the Employment Agreement is not present in either the APA or the CSA. Indeed, there is no provision for NLDC to terminate those agreements. (Exs. 1 & 2).

misrepresentation and what was obtained or given up thereby . . . . Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Wiley*, 106 Fed. Appx. at 521-22; *MathStar, Inc. v. Tiberius Capital II, LLC*, 712 F. Supp. 2d 870, 883-84 (D. Minn. 2010) (dismissing fraud claims because allegations lumped parties together and did not specifically identify who said what to whom, and when).

Counts One and Three of the complaint herein are barren of any factual allegations as to time, place or the identity of the person alleged to have made a false misrepresentation. In Count One, plaintiffs allege they entered into the Agreements based upon "material representations" that "Telvent" – defined in the preamble to the complaint as TUSA, and in ¶8 as TUSA and Telvent GIT, S.A. – intended to perform under the Agreements and that no person at "Telvent" had a financial interest in a product competitive with TollPro. (Complaint ¶73). Under Count Three, unspecified defendants are alleged to have falsely told Sinha that RFPs issued by potential customers had no backoffice component, (Complaint ¶¶56, 59, 85), and to have claimed that certain backoffice business was not "suitable" or "attractive" for TollPro, causing TUSA not to bid for it, so that BancPass or other TollPro competitors could bid instead. (Complaint ¶¶57, 85). These allegations fail to set forth the specific contents of the alleged false statements, the times and places at which they were made, the persons to whom they were made, or the grounds for the assertion that such statements were false. *See MathStar, Inc.*, 712 F. Supp. 2d at 883-84. Indeed, the pleading fails even to identify which defendant is alleged to have made the false statement. Fed. R. Civ. P. 9(b),

however, "does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Petersen v. England*, 2010 U.S. Dist. LEXIS 104224 at *27 (D. Minn. 2010) (Tunheim, J.).  This complaint fails to specify which defendants were responsible for the alleged actions, and fails to "inform each defendant of the nature of [its] alleged participation in the fraud." *Id.*

Plaintiffs' subsuming of alleged wrongdoers into a single group, called "Telvent" in Counts One and Two and "Defendants" in Count Three, violates Rule 9(b)'s particularity requirements: "there are numerous defendants named in the complaint, and each allegedly has a unique role or no role" in the agreements and conduct at issue. *Petersen*, 2010 U.S. Dist. LEXIS 104224 at *28; *see also Lagermeier v. Boston Scientific Corp.*, 2011 U.S. Dist. LEXIS 78525 (D. Minn. July 19, 2011) (dismissing the plaintiff's fraud claims because statements averring that "Defendants" engaged in fraud "fail to meet Rule 9(b)'s specificity requirements as well because Rule 9(b) 'does not allow a complaint to merely lump multiple defendants together . . ..'") (quoting *Petersen*, 2010 U.S. Dist. LEXIS 104224 at *27)).

Counts One, Two and Three, moreover, fail to identify the fraudulent actions for which TUSA, as opposed to the three other defendants, is alleged to be liable. Accordingly, the complaint "fails 'to appraise [the defendant] of the claims against [it] and the acts relied upon as constituting the fraud charged." *Masterson Pers., Inc. v. McClatchy Co.*, 2005 U.S. Dist. LEXIS 29565, 14-15 (D. Minn. Nov. 22, 2005) (quoting

*Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982)).   The complaint must specify which misrepresentations were made by which defendant so that TUSA can properly defend itself.   Plaintiffs' failure to plead the fraud claims against TUSA with the particularity required by Fed. R. Civ. P. 9(b), requires that Counts One, Two and Three be dismissed.

### C.   Count   Four   Should   Be   Dismissed   Because   Common   Law Misappropriation of Goodwill is Not a Cause of Action Under Minnesota Law.

In Count Four of the complaint, plaintiffs allege that they "have made a substantial investment of time, effort, and money over many years in developing goodwill associated with and public recognition of the TollPro and NLDC names and products," (Complaint ¶91), and "Defendants have misappropriated Plaintiffs' and TollPro's goodwill and reputation . . . and are unjustly reaping the benefit of Plaintiffs' and TollPro's trade materials." (Complaint ¶92).   Not only did TUSA purchase all goodwill related to TollPro, (Ex. 1 at §2.1), but there is no "authority for recognition of a separate claim for conversion of goodwill under Minnesota law." *Coyne's & Co. v. Enesco, LLC*, 565 F. Supp. 2d 1027, 1046-1047 (D. Minn. 2008) ("[m]isappropriation of goodwill is generally only an element of trademark, trade dress, or unfair/deceptive trade practices claims; it is not a claim in and of itself.") (dismissing claim).

Because misappropriation of goodwill is not a valid cause of action under Minnesota law, Count Four should be dismissed.

**D.    Counts Five and Six Should Be Dismissed Because Plaintiffs Do Not Have An Enforceable Interest In TollPro or Any Related Intellectual Property.**

        1.    Plaintiffs Do Not Have An Enforceable Interest In TollPro or Any Related Intellectual Property Because NLDC Sold All Assets and Interest to TUSA.

The causes of action in Counts Five and Six both must be predicated upon the plaintiff's ownership of subject property. In this case, however, it is undisputed that, pursuant to the APA, NLDC sold all interest in TollPro to TUSA. (Ex. 1 at §2) (Complaint ¶¶ 46-47). The APA provides in pertinent part for NLDC to sell

> all right, title, and interest of [NLDC] in and to the following assets used in the Business[]: . . .(e) **all Intellectual Property Rights** in and to the name and Trademark 'TollPro', including all registration, renewals, registration rights and related applications, **together with all goodwill related thereto**;...

(Ex. 1 at §2.1) (emphasis added)). Clearly, no plaintiff has any property rights or interest in the intellectual property rights of TollPro. Instead, TUSA **owns** TollPro and all intellectual property rights associated with TollPro, including the software code and technical design documents. (Ex. 1 at §2.1).

        2.    The Complaint Fails To State A Claim for Conversion.

Conversion is defined as "the exercise of dominion and control over goods inconsistent with, and in repudiation of, the **owner's rights** in those goods." *Rudnitski v. Seely*, 452 N.W.2d 664, 668 (Minn. 1990) (emphasis added); *accord DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997); *Hildegarde, Inc. v. Wright*, 244 Minn. 410, 413, 70 N.W.2d 257, 259 (1955). Importantly, "[a] plaintiff's lack of an enforceable interest in

the subject property is a complete defense against conversion." *See, e.g., Coyne's & Co.*, 565 F. Supp. 2d at 1046-1047 *citing Lassen v. First Bank of Eden Prairie*, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994) (dismissing conversion claim: under parties' agreement, plaintiff gained ownership upon payment of purchase price and plaintiff admitted he had not paid for the goods).

Clearly, NLDC, which sold TollPro and all the rights associated with it, cannot now be heard to claim conversion because plaintiffs wish the purchasers had done something different with the product.  Seller's remorse is not actionable.  *See In re Air Transp. Excise Tax Litig.*, 37 F. Supp. 2d 1133, 1143 (D. Minn. 1999) (dismissing conversion claim: "[o]nce plaintiffs' agreed to pay the fixed rate stated in [defendant's] service guide, and once it paid that rate, then it no longer had an enforceable interest in that money for which an action for conversion could lie.").  Count Five should be dismissed.

     2.   The Complaint Fails To Allege Facts Sufficient To Support A Claim of Under the Minnesota Uniform Trade Secret Act.

The Minnesota Uniform Trade Secret Act ("MUTSA") "displace[s] conflicting tort, restitutionary, and other law in this state providing civil remedies for misappropriation of a trade secret." Minn. Stat. § 325C.07(a). The statute by its terms does not affect civil remedies that are not based on misappropriation of trade secrets. *Id.* Thus, common-law claims **directly based on trade secrets** conflict with the MUTSA and are displaced. *See, e.g., CHS Inc. v. PetroNet, LLC*, 2011 U.S. Dist. LEXIS 53393 (D. Minn. May 18, 2011) *citing Micro Display Sys. Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205

(D. Minn. 1988); *Mayo Clinic v. Elkin (Elkin I)*, Civ. No. 09-322, 2010 U.S. Dist. LEXIS 19265, 14-15 (D. Minn. Mar. 4, 2010).

Here, plaintiffs purport to assert a claim for "Misappropriation of Trade Secrets" under Count Six of the Complaint, (Complaint ¶¶106-112), alleging "Defendants have misappropriated Plaintiffs' trade secrets, including, among other things, the software code itself and technical design documents." (Complaint ¶107). This is a common-law claim directly based on trade secrets and is displaced by MUTSA.

Under MUTSA, misappropriation means:

(i) **acquisition of a trade secret of another** by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) **disclosure or use of a trade secret of another** without express or implied consent . . ..

Minn. Stat. §325C.01(3) (emphasis added).   Accordingly, an essential component of Section 325.01 is that the trade secret being misappropriated by that of another. *Id.* Here, again, TUSA is the owner of all trade secrets associated with TollPro. Count Six should be dismissed.

### E.   Count Seven Should Be Dismissed Because Plaintiffs Fail to State a Claim for Breach of Contract.

Plaintiffs' breach of contract claim does not specify that any clause in any of the Agreements was breached.   This Count, instead, is predicated upon allegations of promises made during negotiations that were not reduced to writing in the Agreements:

> Telvent breached the Agreements by, among other things, failing to create an SBS Unit, failing to provide Ashok with staff or funding to operate an SBS unit, failing to provide Ashok with the authority commensurate with his premised

> position, and permitting Telvent officers to market products
> to potential Telvent customers in competition with the SBS
> unit.

(Complaint ¶117).  Additionally, plaintiffs claim that during 2008, "Telvent approach[ed]

Plaintiffs," "stated that it intended to create an entirely new business unit. . .,"

(Complaint ¶¶28-31), and that, during this time, "Ashok was promised that he would be

in charge of this new business unit and . . . [that he] was also promised that he would

have at least 4-5 employees working for him in the SBS unit, along with a commensurate

budget." (Complaint ¶28).

No provision of the APA (25 pages in length, plus 11 schedules and 11 exhibits),

of the CSA (10 pages long), or of the Employment Agreement

(12 pages, including its attachment) supports any of the allegations of plaintiffs' breach

of contract claim.  Where parties have executed fully-integrated agreements that are not

ambiguous, allegations of extraneous promises cannot provide the basis for a breach of

contract claim.  *Winthrop Res. Corp. v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1091 (D.

Minn. 2008) ("Minnesota law is clear that a court may not consider extrinsic evidence in

interpreting a written contract that is both unambiguous and integrated.").

1.   Plaintiffs' Allegations Concerning Alleged Promises Made Prior To
Closing Should Not Be Considered Because The Agreements Are
Fully Integrated.

The primary goal of contract interpretation is to ascertain the intent of the parties.

*Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn.

2003).  When the parties' agreement has been reduced to an unambiguous, integrated

writing, their intent must be determined from the language of the written contract alone.

*Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312-13 (Minn. 2003); *Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.*, 470 N.W.2d 118, 123 (Minn. 1991).   It is well-settled under Minnesota law that oral evidence of discussions, negotiations, or understandings in not admissible to vary or contradict the terms of a clear, unambiguous, and integrated written contract. *See, e..g., Jansen v. Herman,* 230 N.W.2d 460, 463 (Minn. 1975); *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003) (once parties have reduced their agreement to writing, parol evidence is inadmissible to vary, contradict, or alter the agreement).

Moreover, where an agreement contains a merger or integration clause ("a written statement that the contract contains the entire agreement between the parties..." *see* 29A Am. Jur. 2d Evidence § 1107 (2008)), the clause establishes that the parties' writings are intended to be an integration of the agreement.   *Alpha Real Estate Co.*, 664 N.W.2d at 312.  Indeed, even in the absence of a merger or integration clause, Minnesota courts do not necessarily permit consideration of parol evidence where the agreement provides sufficient detail. *Kreitzer v. Xethanol Corp.,* 2009 U.S. Dist. LEXIS 3197, *4 (D. Minn. 2009) (agreement was fully integrated and parol evidence inadmissible despite lack of merger clause because the agreement governed the terms of the plaintiff's employment such as "specifying [his] title..., the amount of his salary, his payment schedule, his eligibility for discretionary bonuses, the signing bonus, [and] his ability to enroll in the company sponsored healthcare plan, ...").

Here, the Agreements were fully integrated as shown by their integration clause:

> **Entire Agreement.** This Agreement. . .the Confidentiality Agreement . . ., and the other certificates, agreements, and other instruments to be executed and delivered by the parties in connection with the transactions contemplated hereby, **constitute the sole understanding of the parties with respect to the subject matter hereof.** No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the parties hereto.

(Ex. 1 at §14.1) (emphasis added).

Any claim that TUSA breached the Agreements by failing to fulfill promises made prior to closing is precluded by the integration clause. *Urban Retail Properties Co. v. Talisman Brookdale, L.L.C.*, 2004 Minn. App. LEXIS 936, *6 ("[Appellant] claims that [Respondent] was in breach because it failed to live up to some of the promises it allegedly made before the parties entered into their agreement. But those claims are precluded by the integration clause in the parties' argument..."). Indeed, even if there were no integration clause, plaintiffs' claims would still be precluded, as were the claims in *Kreitzer*, because the Agreements are highly detailed. (*See generally* Exs. 1, 2 and 3).

2.    <u>Plaintiffs' Allegations of Promises Made Prior To Closing Should Not Be Considered Because the Agreements Are Not Ambiguous.</u>

Parol evidence concerning an integrated contract is admissible only if the contract is ambiguous. *Winthrop Res. Corp.*, 567 F. Supp. 2d at 1091. A contract is ambiguous only if it is susceptible to more than one interpretation based on its language alone. *Lamb Plumbing & Heating Co. v. Kraus-Anderson, Inc.*, 296 N.W.2d 859, 862 (Minn. 1980); *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997) (same). Extrinsic evidence cannot be used to create an ambiguity in an otherwise unambiguous written contract. *RJM Sales & Mktg., Inc. v. Banfi Prods. Corp.*, 546 F.

Supp. 1368, 1374 (D. Minn. 1982).   The interpretation of an unambiguous written contract is a question of law for the Court.  *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).

Plaintiffs' claim of breach is predicated upon two assertions:  first, that Sinha should have been provided a budget and personnel for the SBS unit to better perform the duties of his job; and, second, that "Telvent" officers were permitted to market products to potential customers in competition with the SBS unit.   (Complaint ¶117).   The Agreements, however, contain no ambiguities concerning the subject matter of these allegations.  The Employment Agreement very clearly establishes the parties' respective responsibilities, and provides a specific list of Sinha's duties.  (Ex. 3 at 1).  Plaintiffs' sentiment that Sinha should have received additional benefits under the Employment Agreement does not mean the Employment Agreement is ambiguous, but only that, if Sinha had believed such additional items were material, he should have required their inclusion in the Employment Agreement.

Thus, Plaintiffs are unable to support a breach of contract claim based on allegations of promises made prior to contract formation and with blanket assertions about parties that had no involvement in the Agreements allegedly breached.   The Agreements, which control, negate plaintiffs' allegations.  *Masterson Pers., Inc. v. McClatchy Co.*, 2005 U.S. Dist. LEXIS 29565 (D. Minn. 2005) (on a motion to dismiss, the court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences, and sweeping legal conclusions cast in the form of factual allegations").  Accordingly, Count Seven should be dismissed.

**F.    Count Eight Alleging Breach of Covenant Of Good Faith And Fair Dealing Fails to State a Claim Because It Arises From The Same Conduct Alleged In Count Seven And Minnesota Law Does Not Recognize Such a Duty In Employment Contracts.**

Plaintiffs allege the same facts in support of their claim of breach of covenant of good faith and fair dealing as they do in support of their claim of breach of contract. Consequently, Count Eight should be dismissed. *See Ortega-Maldonado v. Allstate Ins. Co.*, 519 F. Supp. 2d 981 (D. Minn. 2007). Minnesota courts are unequivocal that the law "does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing separate from the underlying breach of contract claim[.]" *Medtronic, Inc. v. ConvaCare, Inc.*, 17 F.3d 252, 256 (8th Cir. 1994) (citing *Orthomet, Inc. v. A.B. Med., Inc.*, 990 F.2d 387, 392 (8th Cir. 1993), and *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 790 (Minn. 1975)).

Here, Plaintiffs allege that "Telvent" breached the covenant because it "willfully and maliciously denied plaintiffs the opportunity to obtain the benefit of their bargain under the terms of the Agreements," (Complaint ¶122) in that Sinha was not provided authority commensurate with his title, staff, and appropriate budget, "undermin[ing] Ashok's efforts to make sales of TollPro-related software"; (Complaint ¶¶51-53); and that "NLDC has not received the benefits of the 2% Incentive R&D Payments..." (Complaint ¶64). These are *the same facts* plaintiffs allege as the basis for Count Seven, their breach of contract claim, requiring dismissal of Count Eight. *See Sports and Travel Mktg, Inc. v. Chicago Cutlery Co.*, 811 F. Supp. 1372, 1383 (D. Minn. 1993) (Minnesota law "does not recognize an independent cause of action for [breach of an implied

covenant of good faith and fair dealing] if it arises from the same conduct underlying a breach of contract claim"); *Seren Innovations, Inc. v. Transcontinental Ins. Co.*, No. A05-917, 2006 WL 1390262, at *8 (Minn. Ct. App. May 23, 2006) ("Minnesota law does not recognize a separate cause of action for breach of the implied covenant of good faith when it arises from the same conduct as a breach-of-contract claim.").

Minnesota law, moreover, "does not recognize an implied duty of good faith and fair dealing in employment contracts." *Brozo v. Oracle Corp.*, 324 F.3d 661, 668 (8th Cir. 2003) (applying Minnesota law); *Poff v. W. Nat. Mut. Ins. Co.*, 13 F.3d 1189, 1191 (8th Cir. 1994) ("[T]he Minnesota Supreme Court has squarely held that there is no implied covenant of good faith and fair dealing in Minnesota employment contracts."); *Hunt v. IBM Mid. Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986) ("[W]e have not read an implied covenant of good faith and fair dealing into employment contracts"). Plaintiffs' claims are based exclusively on alleged breaches of Sinha's Employment Agreement. Therefore, none of the agreements include a covenant of good faith and fair dealing. Count Eight should be dismissed.

### G.   Count Nine Alleging Promissory Estoppel Fails To State A Claim Because A Valid Contract Exists Between the Parties.

It is undisputed that multiple written contracts governed the relationship between NLDC and Sinha on the one hand, and TUSA on the other. Count Nine purports to plead a cause of action for promissory estoppel, an "equitable doctrine that implies a contract in law where none exists in fact." *Javinsky v. Comm'r of Admin.*, 725 N.W.2d 393, 398 (Minn. Ct. App. 2007) (citing *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732,

746 (Minn. 2000)); *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981). Such a claim may not proceed where a legally enforceable contract was formed. *Krutchen v. Zayo Bandwidth Northeast, LLC*, 2010 U.S. Dist. LEXIS 18193, 32-33 (D. Minn. 2010) citing to *Gorham v. Benson Optical*, 539 N.W.2d 798, 801-802 (Minn. App. 1995). In the instant case, the claim of promissory estoppel concerns the same benefits that are at issue in the breach of contract claim. Consequently, the promissory estoppel claim is precluded." *Id*

### H.   Count Eleven Should Be Dismissed Because TUSA Cannot Interfere With Its Own Contract Or Business Relationship.

Count Eleven claims Tortious Interference with Prospective Business Advantage, alleging that TUSA "willfully and maliciously prevented plaintiffs from entering into business relationships with potential backoffice tolling customers, thereby interfering in Plaintiffs prospective business relations with those available and potential customers." (Complaint ¶138). Here, again, plaintiffs ignore the fact that they have sold all of their rights in TollPro to TUSA. TUSA cannot be liable for interfering with its own prospective business advantages. *Nordling v. Northern State Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991) ("The general rule is that a party cannot [tortiously] interfere with its own contract.").

To succeed on Count Eleven, plaintiff, or one of them, must prove:

> 1) the existence of a reasonable expectation of economic advantage
> or benefit belonging to Plaintiff; 2) that Defendants had knowledge
> of that expectation of economic advantage; 3) that Defendants
> wrongfully and without justification interfered with Plaintiff's
> reasonable expectation of economic advantage or benefit; 4) that in
> the absence of the wrongful act of Defendants, it is reasonably

> probable that Plaintiff would have realized his economic advantage
> or benefit; and 5) that Plaintiff sustained damages as a result of this
> activity.

*Harbor Broad., Inc. v. Boundary Waters Broad'rs, Inc.*, 636 N.W.2d 560, 569 (Minn. Ct.

App. 2001) (quoting *Lamminen v. City of Cloquet*, 987 F. Supp. 723, 731 (D. Minn.

1997)).   An important element of the tort is causation:  but for a defendant's alleged

interference, plaintiffs would have secured the business or obtained the business

advantage. *Rainforest Cafe, Inc. v. Amazon. Inc.*, 86 F. Supp. 2d 886, 909 (D. Minn.

2001).

Plaintiffs assert that "Ashok's opportunities to sell the TollPro back office

software" is "undermine[d]" because "Deiteker and Swank have created confusion by

calling potential customers in two separate capacities—both in their capacity as Telvent

representatives (selling lane software) and in their capacity as BancPass representatives

(selling back office software, in competition with Telvent's SBS unit, including the

TollPro back office software)." (Complaint ¶58). Even if this allegation were true – it is

not -- plaintiffs no longer have an interest in TollPro to have standing to assert this

claim. . Plaintiffs sold TollPro to TUSA for a substantial sum, and cannot now claim that

TUSA is somehow tortiously interfered with sales of a product that it owns.  Count

Eleven should be dismissed.

**I.**      **Count Twelve Should Be Dismissed Because a Cause of Action for Tortious Interference with Business Advantage Does Not Exist in Minnesota.**

A review of Minnesota law demonstrates that this State recognizes only two

causes of action for "tortious interference:" Tortious Interference with Prospective

Business Advantage and Tortious Interference with Contract. *See CyberOptics Corp. v. Yamaha Motor Co.*, 1996 U.S. Dist. LEXIS 12614, 50-55 (D. Minn. July 29, 1996). Plaintiffs here purport to plead a non-existent cause of action, and this count should be dismissed.

### J.   Count Thirteen Should Be Dismissed Because the Complaint Fails to Plead a Cause of Action Under the Lanham Act.

In Count Thirteen, plaintiffs claim that unspecified "defendants" violated the Lanham Act, 15 U.S.C. §§ 1051, et seq. because they "made false statements and misrepresentations of and concerning Plaintiffs' [products]" and these representations "were commercial in nature and constituted commercial speech because they were published, disseminated, or otherwise communicated with the intent of increasing Defendants' sales and/or decreasing Plaintiffs' sales and business opportunities." (Complaint ¶¶148-151). As is true of all the allegations of the complaint, this one fails to provide any specificity concening the actual statement or statements alleged to be false, who made them, when and to whom they were made, and the basis for the assertion that they were false.

As to what little substance may be discerned through the fog of plaintiffs' conclusory allegations, a plaintiff seeking to establish a claim under §43(a) of the Lanham Act must "demonstrate a reasonable interest to be protected against the advertiser's false or misleading claims." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 939-940 (8th Cir. 2005). Here again, then, to the extent that plaintiffs seek to allege any harm to them resulting from TUSA's handling or treatment of TollPro, (*see*

Complaint ¶¶63, 148), NLDC has sold TollPro and cannot now claim to have a reasonable interest to be protected. *Id.*   To the extent that NLDC is seeking in this count to allege a claim concerning the E-470 Works product, (Complaint ¶65), plaintiffs have not made any allegation of "commercial speech" cognizable under the Lanham Act. *See Porous Media Corp. v. Pall Corp.,* 173 F.3d 1109, 1122 n.10 (8th Cir. 1999).

Plaintiffs allege false advertising, as forbidden by 15 U.S.C. §1125(a)(1)(B).  That section reads, in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>      . . .
>
> **(B) in commercial advertising or promotion,** misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added); *see Puckmaster, Inc. v. Metalbrik Equip.,* LLC, 2006 U.S. Dist. LEXIS 85156 (D. Minn. 2006).  To prevail on a false-advertising or unfair-competition claim under the Lanham Act, plaintiffs must demonstrate (1) that TUSA made false statements of fact about its own product or Plaintiffs' product **in a commercial advertisement,** (2) the statements actually deceived or tended to deceive a large segment of their audience, (3) TUSA's deception was likely to influence buying decisions, (4) TUSA caused the false statement to enter interstate commerce; and (5) plaintiffs have been or are likely to be injured as a result. *LensCrafters, Inc. v. Vision*

*World, Inc.,* 943 F. Supp. 1481, 1488 (D. Minn. 1996); *see also* Lanham Act § 43(a). To demonstrate liability under the Lanham Act, each of these factors must be satisfied. *Id.*

Although the Lanham Act, does not define the phrase "commercial advertising or promotion," most courts require that the contested representations consist of: (1) commercial speech (2) made by defendant who is in commercial competition with plaintiff (3) for purpose of influencing consumers to buy defendant's goods or services, and (4) **that is sufficiently disseminated to relevant purchasing public to constitute advertising or promotion within industry.** *See, e.g., Gordon and Breach Science Publishers,* 859 F.Supp. at 1534-36; *Medical Graphics Corp. v. Sensormedics Corp.,* 872 F. Supp. 643, 650 (D. Minn. 1994); *Nevyas v Morgan,* 309 F. Supp. 2d 673 (E.D. Penn.) (emphasis added).   Importantly, however, "[u]nder the four factor test articulated [above], ... the representations must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry. *Porous Media Corp. v. Pall Corp.,* 1998 U.S. Dist. LEXIS 23651, *15-22 (D. Minn. June 3, 1998).

Here, the "commercial advertising or promotion" that  allegedly harmed plaintiffs, is alleged to be the following: in connection with the E-470 project, "Telvent made explicit **negative comments** to the director of the E-470 Authority..." (Complaint ¶65) (emphasis added). The phrase "negative comments" is hopelessly vague; it is not made any more specific by the addition of the word "explicit." Whatever the alleged comments may have been, they cannot support a complaint unless they are quoted verbatim.. In any event, comments made to one unnamed individual are a far cry from the advertising

campaigns addressed in Lanham Act cases. *See, e.g., P&G Co. v Haugen*, 222 F.3d 1262 (10th Cir. 2000) (representations must be disseminated sufficiently to relevant purchasing public to constitute advertising or promotion within that industry).   Count Thirteen should be dismissed.

### K.   Count Fourteen Should Be Dismissed Because Plaintiffs Do Not Plead Defamation With The Requisite Specificity.[4]

Under Count Fourteen, plaintiffs purport to allege defamation on the grounds that unspecified "defendants **suggested** to one of the directors of the E-470 Authority project that the Authority should not negotiate with Ashok by falsely stating that Ashok was going to be leaving soon" and "Telvent made specific **negative comments** to the director of the E-470 Authority..." (Complaint ¶¶61, 65; Errata ¶158) (emphasis added).[5]  Here, again, these alleged, unquoted, unattributed "negative comments" are not made specific by the mere act of calling them "specific."   One cannot even tell from the pleading whether this cause of action is intended to sound in libel or in slander.

These allegations fall woefully short of the specificity required under Minnesota law when pleading defamation. *See Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000) (defamatory matter must be set out verbatim); *Stead-Bowers v. Langley*, 636 N.W.2d 334, 342 (Minn. Ct. App. 2002) (affirming denial of

---

[4] Count Fourteen was not included in the complaint as originally filed, but, rather in the Errata. (Doc. 3).

[5] Plaintiffs also allege in ¶63 that unspecified "defendants have at various times denigrated TollPro...". To whatever extent plaintiffs seek to incorporate this allegation into their defamation claim, we note, again, that plaintiffs have sold all of their rights to TollPro and TUSA cannot be liable for defamation of a product it owns.

motion to amend complaint because plaintiff failed "specifically plead the alleged defamatory statements"); *Am. Book Co. v. Kingdom Publg. Co.*, 73 N.W. 1089, 1090 (Minn. 1898) (it is "absolutely necessary to set forth in precise words," otherwise, "the court has no means of ascertaining their actionable quality."); *Special Force Ministries*, 584 N.W.2d at 794 (paraphrasing or merely characterizing the content of statements does not suffice to plead a viable defamation claim); *Pope v. ESA Servs.*, 406 F.3d 1001, 1011 (8th Cir. 2005) (affirming dismissal: the plaintiff must, at a minimum, "allege who made the allegedly libelous statements, to whom they were made, and where.") (applying Minnesota law) (internal quotation omitted).  Count Fourteen should be dismissed.

**L.**     **Count Fifteen Should Be Dismissed Because a Cause of Action for Unjust Enrichment Will Not Lie When the Parties Had Valid Contracts and Because This Claim Is Displaced By MUTSA.**

Plaintiffs' rights as against TUSA are clearly defined by three detailed written contracts. (Ex. 1-3).  "Where the rights of the parties are governed by a valid contract, a claim for unjust enrichment must fail."  *Colangelo v. Norwest Mortgage, Inc.*, 598 N.W.2d 14, 19 (Minn. Ct. App. 1999) *citing Midwest Sports Mktg, Inc. v. Hillerich & Bradsby, Ltd.*, 552 N.W.2d 254, 268 (Minn. App. 1996), *review denied* (Minn. Sept. 20, 1996); *see also U.S. Fire Ins. Co. v. Minnesota State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) ("equitable relief cannot be granted where the rights of the parties are governed by a valid contract."); *N.W. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 n.4 (8th Cir. 1997) (same).  Plaintiffs, of course, admit that valid contracts exist between the parties, (Complaint ¶¶ 34-50) and that these contracts are full agreements that "concern the details of compensation."  *Id.*   For example, the

Employment Agreement fully outlines Sinha's "Responsibilities" and specifies the details of his compensation. In addition, the CSA provides for a "Description of the Services" that are to be performed and includes all payments to be made to NLDC for such performance. Finally, the APA provides for "Price and Payment" for the sale of certain assets from NLDC to TUSA. (*See generally* Exs. 1-3). On this ground, therefore, the claim for unjust enrichment must fail. *See Bartholomew v. Gen. Elec. Capital Corp. (In re Tricord Sys.)*, 2004 U.S. Dist. LEXIS 18456, 9-10 (D. Minn. Aug. 27, 2004).

The claim of unjust enrichment, moreover, is based upon "possession and control of the TollPro software," (Complaint ¶164), and the content of that software is indisputably a trade secret. Accordingly, this cause of action is also preempted by the MUTSA. *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988). Count Fifteen should be dismissed as a matter of law.

## IV.   <u>CONCLUSION</u>

Plaintiffs have clearly failed to set forth any legally cognizable claims. As a result, defendant TUSA respectfully requests that the Court dismiss Counts One through Nine and Counts Eleven through Fifteen of the complaint.

LOMMEN, ABDO, COLE, KING & STAGEBERG, P.A.

Dated:  July 29, 2011

By <u>s/Stephen C. Rathke</u>
Stephen C. Rathke, I.D. No. 89771
2000 IDS Center
80 South 8th Street
Minneapolis, MN  55402
(612) 339-8131
FAX: (612) 339-8064
steve@lommen.com

and

Victor Genecin (NY Bar No. VG 9733)
SQUIRE, SANDERS & DEMPSEY, LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY  10112
(212) 872-9800
FAX:  (212) 872-9815
victor.genecin@ssd.com


*ATTORNEYS FOR DEFENDANT
TELVENT USA CORPORATION*